**STATE of Minnesota, Respondent,**

v.

**Joshua John DeROSIER, Appellant.**

No. A03–784.

Supreme Court of Minnesota.

April 21, 2005.

Mike Hatch, Attorney General, St. Paul, MN, Donald F. Ryan, Crow Wing County Attorney, Brainerd, MN, for Respondent.

John Stuart, State Public Defender, Michael F. Cromett, Assistant Public Defender, Minneapolis, MN, for Appellant.

## OPINION

ANDERSON, RUSSELL A., Justice.

Appellant Joshua John DeRosier was convicted and sentenced in Crow Wing County District Court for first-degree murder, in violation of Minn.Stat. § 609.185(a)(1) (2004), in connection with the shooting deaths of his grandmother and step-grandfather. On appeal, DeRosier claims that he was denied a fair trial because various hearsay statements were admitted, the prosecutor committed misconduct in closing argument by referring to DeRosier's failure to testify, the evidence was insufficient to support the convictions and he was denied a speedy trial. We affirm.

DeRosier was born on December 30, 1982. Periodically, he lived in the basement of the rural Brainerd home of his grandmother Angeline (Angie) Bieganek and her husband, Theodore (Ted). According to trial testimony, DeRosier had a good relationship with his grandmother, who helped him financially, had "always pretty much been there for him," and "stuck by him." DeRosier helped Ted in a woodworking shop in the home's detached garage, but there had been friction between them. There were "rules," such as keeping quiet and parking by the detached garage so Ted could leave from the attached garage whenever necessary. At some point, Ted told Angie that either DeRosier or he had to leave. In October 2001, DeRosier moved to the Paul Bunyan Inn in Brainerd where he worked from 11:00 p.m. to 7:00 a.m. as the night caretaker in exchange for a room. DeRosier would return to the Bieganek residence, a five to seven minute drive from the inn, to do his laundry.

In mid-October 2001, Angie helped DeRosier purchase a 2000 Chevrolet pickup truck by co-signing the loan and applying for credit life insurance that named her and DeRosier as insureds. DeRosier struggled to make the monthly truck payments. Angie withdrew funds from a trust account she had previously established for DeRosier. She gave DeRosier $400 of the funds and kept the remaining money for debts DeRosier owed her. DeRosier understood that he owed his grandmother money, but was upset that the $400 would not cover the month's truck payment. He told a girlfriend that life would be easy for him if something were to happen to his grandparents because of the credit life insurance, and told another friend that he wished something would happen to his grandmother so the insurance would pay off the truck.

On December 22, 2001, DeRosier went to his uncle Gregory Schley's farm southeast of Brainerd for help with finding employment or living arrangements. The door was unlocked but no one was inside because Schley, his son, and his son's fiancée were out cutting wood, so DeRosier used the bathroom and left a note for Schley indicating that he had "stopped by to wish you a merry X-mas & to B.S. a little—nothing special * * * 2:57 pm Sat."

On the morning of December 23, 2001, DeRosier went to his grandfather John Viet's home in Brainerd. DeRosier told Viet he was going to shoot at a gravel pit and needed some .22–caliber shells, and also asked Viet how he should handle his gun-shy puppy. Viet gave DeRosier advice and a container of .22–long rifle shells.[1] They visited for a while, DeRosier

---

1. During an interview with police on December 24, DeRosier said he did not take Viet's rifle shells, but the carton could not be found in the home where he described leaving it.

DeRosier also told police he had no gun, could not have one, and did not recently use one. Schley, DeRosier's uncle, testified that DeRosier admitted to him during a phone

left, and then returned to Viet's later in the day for Christmas supper.

Later that day, around 9:00 p.m., DeRosier met his friend Ryan Franz at Pauline's, a restaurant and bowling alley near the Paul Bunyan Inn. He also chatted with Leah Fossum, a former girlfriend, and invited her to his room. DeRosier and Franz left Pauline's shortly before 11:00 p.m. and went to DeRosier's room where they played video games, and Fossum went to a Perkins restaurant with friends. After dropping off her friends, Fossum went to DeRosier's room, arriving around 12:30 a.m., on December 24. By that time, Franz had left. DeRosier invited Fossum to Christmas dinner at the Bieganeks' home, but Fossum had to work. DeRosier and Fossum both knew DeRosier was to relinquish his key to the back door of the Bieganek residence that day, which upset DeRosier because he would be unable to do laundry there when no one was home.

Fossum stayed in DeRosier's room until about 1:15 or 1:30 a.m., and as she was leaving DeRosier said he had to take his puppy outside. He put on his cap and jacket and asked her to call him when she got home. After arriving home, Fossum attempted twice to call DeRosier's room, with no answer. She then reached DeRosier on his cell phone and asked whether he was taking calls in the room. DeRosier explained that he had been running errands, including delivering towels to guests, and had just returned to his room.[2] Telephone records indicated that the call was made at 2:22 a.m. and lasted two minutes, but it was impossible to determine DeRosier's location at that time. Between 5:00 and 6:00 a.m., as a motel guest, who was an auto mechanic, and the guest's fiancée were leaving, a newer Chevrolet pickup, "maybe about a '99, 2000," was pulling in, seemingly in a hurry. The pickup had a lone male occupant. The guest later recognized the truck in a newspaper photograph taken outside the Bieganek residence.

At 11:00 a.m. on December 24, DeRosier called 911 to report that he had found Angie and Ted deceased in their bed. When law enforcement arrived, they found DeRosier's 2000 Chevrolet pickup parked in front of the attached garage, a laundry basket and clothing on the ground near the front door, an unfired .22–caliber bullet on the front stoop, broken glass from the front door outside and inside the door, and a woodworking clamp on the entryway floor. DeRosier was asked to wait in the living room with his puppy.

In the bedroom, Angie and Ted were found shot to death. They appeared to be in normal sleeping positions. Each sustained a single gunshot wound to the temple, and a bullet also passed through Ted's right shoulder and jaw and then broke the watch on his left wrist. The time on the watch, which Ted would set ahead by 15 minutes, was 2:08. There were two .22–caliber expended shell casings on the bedroom floor near the door and a third in some bedding. There was also a spent bullet near pieces of Ted's damaged watch on the floor. After examining the casings and bullet, the Minnesota Bureau of Criminal Apprehension (BCA) told local law en-

---

conversation in January 2002 that as a parole requirement, DeRosier could not possess a gun for nine years.

2. When asked by police, DeRosier first recalled that he went to either Room 17 or 19. Room 19 was empty that night, however, and the registered guest in Room 17 told police that he did not call for services. DeRosier then told police that he thought the room number ended in a "7." Investigators were able to contact seven of the twelve guests registered at the motel that night and found no one who had called for services.

forcement they should be looking for a Marlin rifle.

With few exceptions, the house did not appear disturbed. The scene was inconsistent with the scene of a typical residential burglary in which the burglar will "throw the house" looking for valuables. To law enforcement, it looked as if someone had walked in, shot the victims, and walked out because it was "pretty clean as far as the crime scene goes." Law enforcement also canvassed the neighborhood, searched dumpsters and searched DeRosier's motel room and pickup, under warrants, but nothing significant was found.

Law enforcement officers interviewed DeRosier several times on December 24 and 25, 2001. He said he had lived with his grandmother in the past and had gone to the house on the morning of December 24 to do laundry. He said he parked in front of the garage, got out of his truck, let the puppy out, and he was "rounding" the truck with his laundry and noticed that glass was broken out of the front door and that the door had been forced open. He hurried to enter the home, dropping the laundry along the way, called for his grandmother but received no answer, and moved quickly to the bedroom where he found Angie and Ted dead. He said he did not kill them.

On December 25, Schley was in his basement working on an ice auger when he realized that his son's .22–caliber Marlin was missing from a gun rack. The family's guns had been cleaned in mid-November, shortly after deer season, and Schley was in the basement every day. After asking family members whether someone had taken the gun, Schley reported it missing on December 28. Law enforcement obtained the weapon's serial number from a federal firearms transaction record and reported the weapon as stolen in a national database.

On December 31, DeRosier went to the Law Enforcement Center to retrieve mail that had been delivered to the Bieganeks' residence, including a letter from an insurance company giving notice that the application for the credit life policy on the 2000 Chevrolet had been denied. The officer explained the notice to DeRosier, who had no reaction. DeRosier then contacted someone at Brainerd Used Cars who explained that the credit life insurance had been denied.

On February 16, 2002, at about 3:00 p.m., the caretaker at Circle Pines Apartments saw a .22–caliber Marlin rifle alongside the road leading into the complex, in plain view on top of some snow. He normally traveled the road two or three times a day and had not seen the gun there before. The rifle was loaded and the butt had been broken off. The manager turned over the rifle and ammunition to law enforcement. The serial number on the Marlin matched the serial number on the rifle missing from the Schley residence. A BCA firearms examiner determined that the Schley Marlin had fired the bullets whose casings were found at the Bieganek crime scene.

On February 19, 2002, law enforcement officers confronted DeRosier with evidence from the investigation. At the end of the interview, he was taken into custody for murder. A grand jury subsequently indicted him for first-degree murder in the deaths.

At trial, in addition to physical evidence and forensic analysis, there was evidence that DeRosier had told others that he wished Angie would get a divorce; that he wished it was just him and his grandmother because he did not like Ted; that he hated Ted, they did not get along, and he wanted Ted out of the picture so he could be the man of the house; and that he

wanted Ted dead. Also, over DeRosier's objection, the state elicited out-of-court statements about a variety of topics that Angie made to friends. DeRosier exercised his Fifth Amendment rights and did not testify. The jury found DeRosier guilty as charged. The district court entered judgments of conviction and imposed consecutive life sentences. This appeal followed.

## I.

DeRosier challenges the admission of hearsay statements by Angie to a friend, arguing that the statements were inadmissible under evidentiary rules and the Confrontation Clause in the Sixth Amendment to the United States Constitution.[3] The state sought admission of the statements under the state-of-mind and residual catch-all exceptions to the hearsay rule, asserting that the statements were relevant to issues concerning access to the Bieganek residence, motive, and DeRosier's relationship with the Bieganeks. The district court ruled that the following categories of hearsay evidence were admissible: DeRosier's possession of a key to the Bieganek residence; the changing of locks of exteriors doors of the Bieganek residence; DeRosier doing laundry at the Bieganeks' residence; all aspects of DeRosier's purchase of the 2000 Chevrolet pickup truck, including payments and Angie's position about another family member taking possession and responsibility for payments on the truck; the savings or trust fund Angie had set up for her grandchildren, including, but not limited to, the establishment of, cashing out of, and distribution of proceeds from said fund.

██ Evidentiary rulings are committed to the district court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Litzau*, 650 N.W.2d 177, 182 (Minn.2002) (citing *State v. Bjork*, 610 N.W.2d 632, 636 (Minn. 2000)). Although appellate courts review the presence or absence of historical facts for clear error, the surrounding circumstances relevant to a Sixth Amendment evaluation are reviewed de novo. *Lilly v. Virginia*, 527 U.S. 116, 136–37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

### State-of-mind hearsay exception

██ Generally, hearsay evidence is inadmissible unless it comes within a recognized exception. Minn. R. Evid. 802. Under one recognized exception, Minn. R. Evid. 803(3), a declarant's statements about his or her own then-existing state of mind are admissible.[4] To be admissible under the state-of-mind exception,

> [T]he statement must be contemporaneous with the mental state sought to be proven. [T]here must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts. [T]he declar-

---

**3.** The Confrontation Clause ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI. DeRosier acknowledges that the hearsay at issue "appears to be 'non-testimonial' hearsay" and not subject to analysis under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**4.** Minn. R. Evid. 803(3) excludes from the general inadmissibility rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

ant's state of mind must be relevant to an issue in the case.

5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.05[2][a], at 803–28, 803–29 (Joseph M. McLaughlin ed., 2d ed.2005) (internal footnotes and numbering omitted). Admissibility of state-of-mind hearsay also turns on weighing probative value against the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981) (state-of-mind hearsay extremely prejudicial); Minn. R. Evid. 403.

■ Ordinarily, a homicide victim's state of mind is not relevant to whether the defendant committed the crime. *See State v. Buggs*, 581 N.W.2d 329, 340 (Minn. 1998) (excluding homicide victim's hearsay statements reflecting defendant's past threats and abuse); *Ulvinen*, 313 N.W.2d at 428 (stating homicide victim's state of mind was not at issue). But a homicide victim's state of mind regarding the defendant may become relevant "where the defendant raises the defense of accident, suicide, or self-defense." *State v. Bauer*, 598 N.W.2d 352, 367 (Minn.1999) (quoting *State v. Blanchard*, 315 N.W.2d 427, 432 (Minn.1982)); *see also State v. Steinbuch*, 514 N.W.2d 793, 797 (Minn.1994) (concluding that statements that homicide victim was going to take her girls and leave was relevant to rebut defendant's claim that the victim, his wife, murdered his daughter and step-daughter). Nevertheless, the state-of-mind exception "does not pave the way for statements by one person to prove another's state of mind." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 438, at 416 (2d ed.1994). Here, it appears that much of the hearsay evidence was about what DeRosier was alleged to have done, was unrelated to the declarant's state of mind, and therefore was not admissible under that exception.

*See State v. Bradford*, 618 N.W.2d 782, 798 (Minn.2000) (holding that homicide victim's statements about what the defendant had done to her did not fall within this hearsay exception because they did not get to the declarant's state of mind); Minn. R. Evid. 803(3) (rule does not include "a statement of memory or belief to prove the fact remembered").

*Unavailable declarant residual exception*

■ An otherwise inadmissible hearsay statement of an unavailable declarant may be admitted at trial if the statement fits within Minn. R. Evid. 804(b)(5), the so-called "catchall" exception:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name, address, and present whereabouts of the declarant.

The court should make findings "explicitly on the record unless there is a waiver, explicitly or by silence, or the basis of the ruling is obvious." Weinstein & Berger, *supra*, § 807.04[1], at 807–34, 807–35 (citing *United States v. Sposito*, 106 F.3d

1042, 1046–49 (1st Cir.1997) (finding prior immunized testimony was related to a material fact, that it was more probative on the point than any other testimony the government could procure, and that it included adequate guarantees of trustworthiness)).

In this case, the court made no specific findings regarding the requisite elements of the rule, and the relative necessity for the evidence was neither obvious nor clear. While the necessity element does not mean that the evidence be essential, it does require the consideration of "other admissible evidence through reasonable efforts." Weinstein & Berger, *supra*, § 807.03[3][a], at 807–24.3. Much of the hearsay in DeRosier's trial had already been procured from his statements to law enforcement and to other witnesses, as well as from documents. The various aspects of the purchase of the 2000 Chevrolet were covered in DeRosier's police statements and third-party records, DeRosier talked about the fund set up for the grandchildren, DeRosier and two other witnesses talked about DeRosier doing laundry at the Bieganeks', DeRosier told law enforcement about locks on the doors of the residence, and a witness testified that DeRosier told her that he was upset about having to surrender his house key to the Bieganeks.

■ DeRosier asserts that the admission of hearsay violated his right of confrontation and that he is entitled to a new trial. Even assuming a constitutional violation, a defendant is not automatically entitled to a new trial when his constitutional rights are violated. *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997). However, a conviction can stand only if the error committed was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. 824; *Juarez*, 572 N.W.2d at 291. The

error cannot be said to be harmless beyond a reasonable doubt, and is therefore reversible, where "there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. When applying the *Chapman* harmless error test, appellate courts must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt. *Id.* Inasmuch as the victim's hearsay statements were cumulative, merely corroborating other witnesses' testimony and were not otherwise prejudicial, the verdict rendered was surely unattributable to any error in admitting the hearsay statements.

## II.

■ DeRosier also argues that the prosecutor committed serious misconduct during closing argument by commenting on his failure to testify. DeRosier argues that several statements in the prosecutor's closing argument violated his due process and fair trial rights because they alluded to his failure to testify. A reviewing court must first examine the challenged conduct to determine whether the prosecutor committed misconduct. *State v. Ford*, 539 N.W.2d 214, 228 (Minn.1995). A reviewing court also retains, under its supervisory power, the right to reverse "prophylactically or in the interests of justice," without a further finding of prejudice. *State v. Salitros*, 499 N.W.2d 815, 820 (Minn.1993). Due process guarantees in our state and federal constitutions include the right to a fair trial. *See State v. Reardon*, 245 Minn. 509, 513–14, 73 N.W.2d 192, 195 (1955). While prosecutors do have the right to legitimately argue, analyze, explain evi-

dence and present proper inferences, *see, e.g., State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn.1980), they may not directly or indirectly comment on a defendant's failure to testify. *United States v. Triplett*, 195 F.3d 990, 995 (8th Cir.1999); *State v. Whittaker*, 568 N.W.2d 440, 451 (Minn. 1997) (citing *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)).

At the close of evidence, the district court instructed the jury. At DeRosier's request, the instructions included that DeRosier had the right not to testify, guaranteed by the federal and state constitutions, and that the jury should draw no inference from the fact that DeRosier had not testified. The state then proceeded with its closing argument. In explaining its theory of the case and discussing the state's failure to provide certain evidence, the prosecutor stated:

> Now when that gun got broken there is no evidence. Where that gun butt went, nobody knows. *Mr. DeRosier probably knows. In fact, Mr. DeRosier does know.*
>
> *The State doesn't know.* It never was found. It could have been in one of those dumpsters. It could have been thrown anyplace. It was never recovered. Why did he break it off? *Only Mr. DeRosier knows. Obviously we don't have any information to tell you.*[5]

(Emphasis added.) DeRosier asserts that these remarks indirectly referred to his failure to testify because the jury would naturally and necessarily have understood them as such.

We believe DeRosier has a legitimate complaint. "Indirect references to a defendant's failure to testify are * * * prohibited if they either (1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have understood them as a comment on defendant's failure to testify." *Sidebottom v. Delo*, 46 F.3d 744, 759 (8th Cir.1995) (internal quotation omitted). The state introduced many statements that DeRosier made to law enforcement. Therefore, the prosecutor's present-tense comments in closing argument that the defendant "knows" what happened, coupled with a remark that "it would be nice to know" what happened, are of such a character that a jury would naturally and necessarily take them to be a comment on the defendant's failure to testify.

Nevertheless, the misconduct here was not per se reversible error. Comment on a defendant's election not to testify is per se reversible error if (1) the comment is extensive, (2) the comment stresses to the jury that an inference of guilt from silence is a basis for conviction, and (3) there is evidence that could have supported acquittal. *Whittaker*, 568 N.W.2d at 451. If these factors are absent, the misconduct is reviewed for harmless error. *Id.* In evaluating an error in the context of a prosecutor's reference to

---

5. The prosecutor also talked about four Christmas presents allegedly missing from the Bieganek house:

> Now, we know he didn't put it in the dumpsters—it didn't go into the garbage cans of the Bieganeks. It didn't go in any of the dumpsters in the immediate vicinity of the Paul Bunyan Inn, law enforcement checked all of those. He was smart enough to go someplace else.

> Did it all go to one place? Did it go to multiple places? It would be nice to know that. *It would be nice to know exactly where it went, but we don't.* It was never found. *Mr. DeRosier could have put it in one dumpster, two dumpsters, up to four dumpsters, the presents I'm talking about, anywhere outside of that immediate vicinity, and they were never found.*

(Emphasis added.)

the defendant's failure to testify, "[t]he question a reviewing court must ask is this: absent the prosecutor's [improper comments], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *Triplett,* 195 F.3d at 996 quoting *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). In view of the minimal cumulative effect of the comments, the substantial amount of properly admitted evidence of guilt, the lack of an objection, and prior instruction on the defendant's right not to testify, we conclude that the error was harmless. *See Triplett,* 195 F.3d at 997–98.

### III.

DeRosier argues that the circumstantial evidence as to the identity of the perpetrator was insufficient to support the verdict. Our review of the sufficiency of the evidence is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Fields,* 679 N.W.2d 341, 348 (Minn.2004) (quoting *State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989)).

Circumstantial evidence is entitled to the same weight as direct evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt. *State v. Olhausen,* 681 N.W.2d 21, 26 (2004). The conviction may stand only where the circumstances form "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Jones,* 516 N.W.2d 545, 549 (Minn.1994) (quoting *Wahlberg,*

296 N.W.2d at 411). Reversal is proper if facts proving an essential element of the offense are left more to conjecture and speculation than to reasonable inference, or when the interests of justice so require. *State v. Haynes,* 248 Minn. 545, 548–49, 80 N.W.2d 859, 862–63 (1957); *see also State v. Boyce,* 284 Minn. 242, 261, 170 N.W.2d 104, 116 (Minn.1969).

Here, there was ample evidence circumstantially connecting DeRosier to the homicides, including evidence that he had access to the murder weapon and ammunition; that he left the motel around 1:30 a.m. on December 24, 2001; that he had a key to and familiarity with the victims' residence; that the fatal injuries were inflicted sometime around 1:53 a.m. while the victims slept; that DeRosier was not in his room around the time of the homicides; that a motel guest and auto mechanic observed a 1999 or 2000 Chevrolet pickup pull hurriedly into the motel between 5:00 and 6:00 a.m.; that the guest recognized the truck in a newspaper photograph taken at the homicide scene; that DeRosier parked his 2000 Chevrolet in front of the victims' attached garage after the homicides; that DeRosier thought his financial burdens would be resolved by his grandmother's death; and that he hated Ted. Viewing the evidence in the light most favorable to the verdict, we conclude the evidence clearly supports the jury's verdict.

### IV.

In a pro se supplemental brief, DeRosier argues that he was denied the right to a speedy trial. The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 6 of the Minnesota Constitution. By rule in Minnesota, trial is to commence within 60 days from the date of the demand unless good cause

is shown upon the prosecuting attorney's or the defendant's motion or upon the court's initiative why the defendant should not be brought to trial within that period. Minn. R.Crim. P. 6.06, 11.10. In determining whether a delay constitutes a deprivation of the right to a speedy trial, courts consider (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his or her right to a speedy trial, and (4) whether the delay prejudiced the defendant. *Barker v. Wingo,* 407 U.S. 514, 530–33, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State v. Widell,* 258 N.W.2d 795, 796 (Minn.1977) (adopting *Barker* inquiry). When the overall delay in bringing a case to trial is the result of the defendant's actions, there is no speedy trial violation. *State v. Johnson,* 498 N.W.2d 10, 16 (Minn.1993). Here, delay in bringing the matter to trial was occasioned by defense motions for a change of venue, continuances, and a Rule 20 evaluation. In addition, DeRosier never moved for a speedy trial. Upon balancing all relevant factors, we conclude that the delay did not violate DeRosier's speedy trial right.

Affirmed.