STATE of Minnesota, Respondent,

v.

Tameca GRIFFIN, Appellant.

No. A07–2012.

Court of Appeals of Minnesota.

Feb. 10, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mark N. Lystig, Assistant County Attorney, St. Paul, MN, for respondent.

John Stuart, State Public Defender, Benjamin J. Butler, Assistant State Public Defender, St. Paul, MN, for appellant.

Considered and decided by HUDSON, Presiding Judge; LARKIN, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge [*].

Appellant challenges her convictions of third-degree assault, fourth-degree assault upon a police officer, and obstruction of a legal process, arguing that the district

---

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

court (1) denied appellant's right to a speedy trial, (2) abused its discretion by permitting expert testimony regarding whether the victim suffered substantial bodily harm, and (3) abused its discretion by improperly instructing the jury; and asserting instances of prosecutorial misconduct. Appellant also raises additional issues in her pro se brief. Because appellant was deprived of her right to a speedy trial as guaranteed by the United States and Minnesota constitutions, we reverse.

## FACTS

While shopping at a supermarket on September 14, 2006, appellant Tameca Griffin sampled some grapes for taste and was confronted by St. Paul Police Officer Laura Syring, who was working off-duty as a store security officer. From this point, the versions of events as developed at the trial diverge. According to Griffin, Officer Syring rudely accused her of stealing. Griffin asked to see a store manager, and as she walked toward the manager's location Officer Syring shoved her and ordered her to leave the store. Griffin demanded that Officer Syring not touch her. Officer Syring then sprayed Griffin's face with pepper spray, causing a reaction in Griffin, who suffers from asthma. Griffin testified that she felt she was being attacked, and the two engaged in a brawl.

The state's evidence paints a more elaborate picture. Officer Syring testified that she politely approached Griffin to tell her not to eat the grapes. Griffin at first ignored her but then began yelling and swearing, getting so close that Officer Syring felt Griffin's breath on her face. After telling Griffin to leave, Officer Syring took her by the arm to lead her out of the store. Griffin continued to yell and swear, demanding that Officer Syring not touch her. Officer Syring pronounced Griffin under arrest and reached for her arm again, but Griffin pulled away. Officer Syring then clutched Griffin's hair in an attempt to get her under control. Griffin struck Officer Syring in the face, and the incident escalated to an all-out battle. Officer Syring was thrown onto a checkout stand and struck her head on the metal end of the counter. She repeatedly attempted to gain control of Griffin by using her pepper spray and baton, to no effect. She then used her radio to call for help. In the meantime, store employees and customers attempted to assist, but were unable to control Griffin. Other officers arrived, and the struggle to control Griffin continued. Finally, an officer used a Taser to bring Griffin under control, and she was placed into an ambulance.

Officer Syring was taken to the hospital with a sprained thumb and neck and back injuries. X-rays were negative for fractures, and she was discharged with "[a]pparent minor" injuries. She returned to the hospital two days later with complaints of headaches and vomiting. She was diagnosed with "post-concussive syndrome" and given additional medication, although a doctor who treated her testified at trial that she did not feel that Officer Syring had suffered a concussion.

The state charged Griffin with three counts: third-degree assault; fourth-degree assault upon a police officer; and obstruction of a legal process. Griffin appeared before the district court and demanded a speedy trial on October 4, 2006. A jury trial was initially set for November 27, but at a pretrial conference on November 15, for no stated reason, the trial was rescheduled for December 4, 2006, 61 days after Griffin's speedy-trial demand. On December 4, 2006, for no reason other than that there were other cases scheduled for trial that day, the case was placed on standby status. The district court explained to Griffin that "standby status"

meant that she must be available and ready for trial within two hours of the time her attorney was notified. The district court further explained that Griffin was required to either be at a number where her attorney could contact her or contact her attorney regularly enough that she could be in court within the two hours. Griffin was warned that her failure to appear in court within those two hours would result in a warrant issued for her arrest.

The trial was rescheduled and continued without explanation no less than 30 times between December 4, 2006 and June 5, 2007. Initially, Griffin, a resident of Chicago, Illinois, was restricted by the standby status from December 4 until December 21, 2006, during which time trial was scheduled and continued seven times. At the December 21 hearing, Griffin sought modification of her restrictive release conditions, noting that the case was already three weeks past the 60–day speedy-trial standard. The district court granted Griffin permission to go home to Chicago for Christmas only, requiring her to return to Minnesota by December 27 or face arrest. Thereafter, no trial date was set until the case was reinstated to standby status on January 30, 2007. Trial was scheduled and continued on January 30 and 31, and on 11 dates in February 2007. No trial dates were set in March. Griffin's case was again placed on standby status on April 2, 2007, but the trial was continued that day and on eight more dates through April 18. Thereafter, no trial dates were set until the case was reinstated to the standby calendar on June 4, 2007, and the jury trial began the next day, eight months after Griffin lodged her speedy-trial demand. In sum, the district court restricted Griffin by virtue of the standby status

for at least 58 week days over the period of six months from December 4, 2006, to June 5, 2007.[1]

Prior to the selection of the jury on June 5, 2007, Griffin moved for dismissal of the charges on the ground that she had been deprived of her constitutional right to a speedy trial. The district court denied the motion, and the trial proceeded. The jury found Griffin guilty on all counts, and she appealed.

## ISSUES

I. Must Griffin's convictions be reversed and vacated because her right to a speedy trial was violated?

II. Is Griffin entitled to a new trial because of irregularities or prosecutorial misconduct occurring at her trial?

## ANALYSIS

### I.

A speedy-trial challenge presents a constitutional question subject to de novo review. *State v. Cham,* 680 N.W.2d 121, 124 (Minn.App.2004), *review denied* (Minn. July 20, 2004). "The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 6 of the Minnesota Constitution." *State v. DeRosier,* · 695 N.W.2d 97, 108 (Minn.2005). "By rule in Minnesota, trial is to commence within 60 days from the date of the demand unless good cause is shown ... why the defendant should not be brought to trial within that period." *Id.* at 108–09 (citing Minn. R.Crim. P. 6.06, 11.10). To determine whether a delay constitutes a deprivation of the right to a speedy trial, a court must balance the following four factors: "(1) the length of the delay, (2) the reason for the

---

1. The total does not include any court holiday or weekends. The record submitted to us is unclear regarding whether Griffin was re-

lieved of the restrictions of standby status during March and May 2007, when no trial dates were set.

delay, (3) whether the defendant asserted his or her right to a speedy trial, and (4) whether the delay prejudiced the defendant." *Id.* at 109 (citing test from *Barker v. Wingo,* 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101 (1972) and *State v. Widell,* 258 N.W.2d 795, 796 (Minn.1977), which adopted the four-part *Barker* inquiry for speedy-trial demands). None of the factors alone is dispositive; rather, the factors are related and "must be considered together with such other circumstances as may be relevant." *State v. Windish,* 590 N.W.2d 311, 315 (Minn. 1999) (quotation omitted). The district court did not analyze the *Barker* factors, but because we review Griffin's claim de novo, we will apply those factors to the facts in the record.

■ The first *Barker* factor is the length of the delay. When the length of the delay is "presumptively prejudicial," it triggers review of the remaining three factors. *Id.* In Minnesota, a delay of more than 60 days from the date of the speedy-trial demand is presumptively prejudicial. *Id.* at 315–16. Here, eight months passed between Griffin's speedy-trial demand on October 4, 2006, and the commencement of the trial on June 5, 2007. The delay, therefore, is presumptively prejudicial and requires review of the remaining *Barker* factors.

■ The second *Barker* factor is the reason for the delay. The state and the courts have the burden of ensuring speedy trials for criminal defendants. *See id.* at 316; *Cham,* 680 N.W.2d at 125. If a defendant's own actions caused the delay, there is no violation of the right to a speedy trial. *State v. Johnson,* 498 N.W.2d 10, 16 (Minn.1993). There may be no violation if the delay is due to good cause, but good cause for delay does not include calendar congestion unless exceptional circumstances exist. *McIntosh v.*

*Davis,* 441 N.W.2d 115, 119–20 (Minn. 1989).

■ Here, nothing in the record suggests that Griffin caused any part of the delay after her demand for a speedy trial on October 4, 2006. The record shows that after eight months and numerous continuances, none of which requested by Griffin, Griffin moved for dismissal. In denying the motion, the district court attributed the delay solely to court congestion, stating:

> We would have gotten to [Griffin's] case earlier if our calendar had allowed it. We unfortunately had pretty full calendars and we give priority to those who have made a speedy trial [demand] and are in custody. And for that reason, [we] have not been able to get to her case until now.

Griffin aptly notes that "overcrowding in the court system is not a valid reason for denying a defendant a speedy trial." *Windish,* 590 N.W.2d at 316 (citing *State v. Jones,* 392 N.W.2d 224, 235 (Minn. 1986)). Because we conclude that the eight-month delay was in no way attributable to Griffin and there is no showing of exceptional circumstances for calendar congestion justifying delay for good cause, this factor weighs in favor of Griffin.

The third *Barker* factor is whether Griffin asserted her right to a speedy trial. It is uncontested that she did so on October 4, 2006, addressed it again on December 21, 2006, and moved for dismissal on the ground of deprivation of that right prior to trial on June 5, 2007.

■ The fourth *Barker* factor is whether the delay prejudiced Griffin. To determine whether a delay prejudices a defendant, this court considers three interests that the right to a speedy trial protects: (1) preventing lengthy pretrial incarceration; (2) minimizing the defen-

dant's anxiety and concern; and (3) preventing possible impairment to the defendant's case. *Id.* The third interest is the most important. *Id.* But it is difficult for a defendant to prove exactly how the case is impaired by a delay. *Id.* at 319. Therefore, a defendant does not have to prove specific prejudice. *Id.* at 318. Generally, an "excessive delay presumptively compromises the reliability of a trial in ways" that cannot be identified. *Doggett v. United States,* 505 U.S. 647, 655, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520 (1992).

In opposing Griffin's motion for dismissal of the charges, the state argued that a "showing of actual prejudice ... is a requirement" of a speedy-trial dismissal. Without analysis of the *Barker* factors, the district court denied Griffin's motion solely on the basis that Griffin had made no showing of prejudice. However, none of the *Barker* factors is "either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Windish,* 590 N.W.2d at 315 (quoting *Barker,* 407 U.S. at 533, 92 S.Ct. at 2182).

"[P]rejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings." *Moore v. Arizona,* 414 U.S. 25, 26–27, 94 S.Ct. 188, 190, 38 L.Ed.2d 183 (1973).

> Inordinate delay ... may seriously interfere with the defendant's liberty, whether he is free on bail or not, and ... may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty.

*Id.* at 27, 94 S.Ct. at 190 (quotations omitted). It is undeniable that prejudice flows from any deprivation of a constitutional right. The prejudice is exacerbated when the deprivation causes protracted loss of liberty. Griffin was not incarcerated while awaiting trial, but neither was she at liberty to pursue ordinary life activities or even return to her home in Chicago during the first six months of the delay. As noted above, for much of that time Griffin's freedom was severely restricted by the standby-status requirements imposed on her by the district court as the case was alternately placed on-call and continued some 30 times. Because of the prejudicial impact of the severity of these restrictions, this factor weighs heavily in Griffin's favor.

Because the *Barker* factors weigh in Griffin's favor, we conclude that her constitutional right to a speedy trial was violated. And because there can be no other effective remedy for the violation that has occurred, Griffin's convictions must be reversed and vacated.

## II.

Griffin appealed for a new trial based on specified irregularities occurring at her trial and she attempts to raise other issues in her pro se brief. Primarily, Griffin contends that the district court abused its discretion by (1) permitting expert-witness testimony regarding Officer Syring's injuries to be expressed in the precise terms of the legal definition of "substantial bodily harm" and (2) improperly instructing the jury on self-defense and essential elements of offenses. Griffin also cites instances of claimed prosecutorial misconduct to be reviewed for plain error.

Because we reverse Griffin's convictions on another ground, there is no need to address these additional claims.

## DECISION

Griffin was deprived of her constitutional right to a speedy trial compelling the reversal and vacation of her convictions.

**Reversed.**