*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1073**

State of Minnesota,
Respondent,

vs.

Cindarion De'Angelo Butler,
Appellant.

**Filed July 20, 2015
Affirmed
Reilly, Judge**

Ramsey County District Court
File No. 62-CR-13-7947

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Stan W. Keillor, Minneapolis, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Reilly, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

Appellant challenges his conviction of aiding-and-abetting assault in the first degree arguing that the district court committed several errors during trial, that the

evidence was insufficient to support the conviction, and that the district court erred in asking the sentencing jury conclusions of law rather than questions of law. We affirm.

**FACTS**

On August 4, 2013, a series of fights broke out, in the middle of a street, between several young women following a house party in St. Paul. As the fights were ending, a young man later identified as R.W. walked by on the way home to his apartment. One of the young women fell to the ground and R.W. walked up to her "with a hand out." An individual in the crowd struck R.W. in the head, and he fell to the ground. R.W. did not get up again.

After R.W. fell to the ground, a group of approximately ten individuals, including appellant Cindarion De'Angelo Butler, began punching, kicking, and stomping on R.W. simultaneously. Multiple people jumped into the air and landed directly on R.W. Members of the group took off R.W.'s pants and began digging through them for his wallet and later attempted to take off his underwear. R.W. did not defend himself or fight back in any way during this attack.

As the assault continued, a young woman "laid [her] body on top of his body" to prevent the crowd from kicking R.W. further. Despite her efforts, the group continued to kick both R.W. and the woman who attempted to help him. When the crowd began "kicking and stomping" the woman lying on top of R.W. and continued to assault R.W., another person "emptied out [his] can of mace" on the individuals and they began running away. R.W. suffered a beating for 5 to 15 minutes.

Police officers arrived at the scene shortly afterwards and found R.W. "laying with his legs and his arms . . . spread out as he lay on the ground." An officer noticed that R.W. "had a lot of head trauma, he was bleeding from the back of his head, and . . . the back of his head looked almost like it was caved in." R.W. was not responsive and several articles of his clothing were missing. There were two pools of blood in the street and marks in between them, indicating that R.W. had been dragged. R.W. was taken to the hospital with what doctors feared was "a nonsurvivable injury," including a severe traumatic brain injury with blood on the inside of his brain and significant swelling causing pressure and herniation on his brain.

The officers who arrived at the intersection considered it a potential homicide scene and taped off the area with crime-scene tape to stop the flow of traffic. A transit bus was stopped at the east end of the perimeter. Police officers later collected the on-board camera tapes from this bus. Police investigators used photographs taken from surveillance video on the bus as well as information posted on Facebook to identify individuals who may have been involved in the assault. The police investigators identified appellant as a potential person of interest.

Police officers executed a search warrant on appellant's house and discovered a pair of tennis shoes and a pair of jean shorts with blood-like stains on them. The Bureau of Criminal Apprehension (BCA) determined that blood on appellant's tennis shoes matched the profile generated from R.W.'s known DNA sample. Bloodstain-pattern analysis revealed that the bloodstains on appellant's tennis shoes were the result of blood drops being dispersed through the air due to an external force.

3

Appellant was charged with one count of assault in the first degree for the benefit of a gang, one count of aiding and abetting assault in the first degree, one count of aggravated robbery in the first degree for the benefit of a gang, and one count of aiding and abetting aggravated robbery in the first degree. Appellant was certified to stand trial as an adult. A jury trial was held and the jury found appellant guilty of the charge of aiding and abetting aggravated robbery in the first degree and aiding and abetting assault in the first degree, and not guilty of the benefit-of-a-gang charges.

Following the verdict, the district court excused the jury to consider whether aggravating factors existed. The special verdict form contained two questions: (1) whether the victim was particularly vulnerable due to reduced physical and mental capacity and the offender knew or had reason to know of this infirmity, and (2) whether the crime was committed as part of a group of three or more offenders who actively participated in the crime. The jury answered both questions in the affirmative. The district court ordered a presentence investigation and the sentencing guidelines recommended a presumptive disposition to commit to the commissioner of corrections for 98 months, with a lower range of 84 months and an upper range of 117 months.

At the sentencing hearing, the state requested an upward durational departure based on the jury's determination that R.W. was particularly vulnerable at the time of the assault and more than three people actively participated in the crime. The district court sentenced appellant to the commissioner of corrections for a term of 196 months, which constituted a double upward durational departure from the guidelines sentence. The district court based its departure on the jury's finding of two aggravating factors and the

4

fact that R.W. was "blindsided from behind as he was reaching out trying to help one of the girls that was on the ground." The district court also concluded that appellant failed to take responsibility for his part in the assault and continued to "deflect" responsibility for his actions. This appeal followed.

## D E C I S I O N

Appellant raises six arguments challenging his conviction: (1) the district court erred in admitting appellant's juvenile adjudication for impeachment purposes, (2) the district court erred in allowing the state to use demonstrative evidence, (3) the prosecutor committed misconduct in the closing argument, (4) the evidence was insufficient to support the conviction for aiding and abetting first-degree assault, (5) the district court erred by presenting questions to the sentencing jury that asked for legal conclusions rather than factual findings, and (6) the district court erred in imposing an upward durational departure at sentencing. We address each argument in turn.

### I.

We first consider appellant's argument that the district court abused its discretion in admitting appellant's juvenile adjudication for impeachment purposes. We review a trial court's evidentiary ruling for a clear abuse of discretion. *State v. Hofmann*, 549 N.W.2d 372, 375 (Minn. App. 1996), *review denied* (Minn. Aug. 6, 1996).

The state indicated that if appellant chose to testify, it would seek to admit evidence of a prior juvenile matter for purposes of impeachment. Specifically, the state intended to use a November 2012 incident, when appellant intentionally gave a false name to the police, to show a prior act of dishonesty. The defense objected based on

Minnesota Rule of Evidence 609(d), which provides that "[e]vidence of juvenile adjudications is not admissible under this rule unless permitted by statute or required by the state or federal constitution." The district court agreed with the state and found that the incident was "fair game" because it involved an act of "dishonesty or false statement regardless of the punishment."

On appeal the state concedes that appellant's argument "appears to have merit, because Rule 609(d) excludes juvenile adjudications for impeachment." And we have previously affirmed the principle expressed in rule 609(d) that juvenile adjudications generally are not available to impeach credibility. *State v. Spann*, 574 N.W.2d 47, 52 (Minn. 1998). However, even if the district court abused its discretion by allowing the state to impeach appellant with his prior juvenile offense, the error was harmless because it did not significantly affect the jury's verdict. *See, e.g.*, *State v. Post*, 512 N.W.2d 99, 102 n.2 (Minn. 1994) (explaining that district court's erroneous admission of evidence is harmless if there is no "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict").

Appellant contends that the district court's ruling was prejudicial because it "prompted appellant's decision not to testify." We do not find this argument persuasive. The state presented testimony from several witnesses identifying appellant as one of the individuals assaulting R.W., and DNA evidence taken from appellant's shoes link appellant to the crime. The district court's ruling that appellant could be impeached with his prior juvenile adjudication, while erroneous, does not constitute reversible error.

## II.

We next turn to appellant's argument that the district court abused its discretion by allowing the state to use demonstrative evidence. Appellant bears the burden of establishing that the district court's decision was erroneous and prejudicial and we will not reverse absent a clear abuse of discretion. *State v. Rhodes*, 627 N.W.2d 74, 84 (Minn. 2001).

The state called an employee from the BCA's forensic science laboratory to testify regarding bloodstain-pattern analysis performed on appellant's shoes. The witness testified that he identified bloodstains on appellant's shoes that were "consistent with a spatter stain," which was the result of a "blood drop being dispersed through the air due to an external force." The state sought to use a demonstrative aid to assist the jury in understanding the witness's answer to a series of questions on the subject of fluid dynamics. The district court allowed the evidence over the defense's objection. The state then posed a series of hypothetical questions to the witness using a soccer ball.

The use of visual aids is within the trial court's discretion and "[s]uch aids are admissible if they will assist the jury in understanding the witness' testimony." *Rhodes*, 627 N.W.2d at 84; *State v. Walen*, 563 N.W.2d 742, 748 (Minn. 1997) (recognizing that the "appropriate test" for admissibility of a visual aid is "relevance, in other words, whether the . . . visual aids are helpful to the jury"). The state used the soccer ball to ask the witness how fluid travels when it comes off of a round surface, if that surface is impacted by a force. The witness testified that if a shoe impacts a round surface, such as a soccer ball, "the shoe is going to impact that [round surface] and depress and . . . the

7

blood is essentially going to squirt out, or be expelled out around the shoe and could potentially come backwards a little bit" in the direction of the kick. On cross-examination, the defense questioned the witness about the soccer ball and the bloodstain-pattern analysis.

Appellant argues that the soccer ball "personalized" and "dramatized" the bloodstain-pattern analysis and was not an "accurate representation of the victim's head." But appellate courts have admitted visual aids for illustrative purposes to allow a witness to explain injuries "from a three-dimensional perspective." *Rhodes*, 627 N.W.2d at 84 (determining trial court did not abuse its discretion); *Walen*, 563 N.W.2d at 748-49 (finding no abuse of discretion where visual aid was used to help "clarify" witness's testimony); *State v. Newman*, 408 N.W.2d 894, 899 (Minn. App. 1987) (concluding trial court properly admitted evidence of a visual aid where item was admitted only for illustrative purposes and defense counsel had opportunity to cross-examine witness), *review denied* (Minn. Aug. 19, 1987).

Based on our caselaw, we determine that the district court did not abuse its discretion. The witness used the visual aid to explain the concept of fluid dynamics, using evidence that had been submitted in the case. Several witnesses testified that a group of people, including appellant, kicked R.W. multiple times in the head while he was lying on the ground. The police officer who first approached R.W. after the attack testified that "the back of his head looked almost like it was caved in." Using the visual aid, the BCA witness testified that when a shoe kicks a round surface, it creates "a little bit of a crater" and expels blood back in the direction of the kick. BCA testing confirmed

8

that appellant had R.W.'s blood on his shoes. The soccer ball likely assisted the jury in understanding the witness's testimony on fluid dynamics and, therefore, we determine the district court did not err in allowing the state to use demonstrative evidence.

## III.

Appellant's third argument is that the prosecutor committed misconduct during closing argument by misstating evidence and minimizing the presumption of innocence and by making comments alluding to appellant's failure to testify. Specifically, appellant argues that (1) the prosecutor misspoke when he said D.R. testified that she saw appellant going through R.W.'s pockets, and (2) the prosecutor improperly alluded to appellant's failure to testify. The defense did not object to these statements during trial and we apply a modified plain-error test. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012) (citing *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006)).

Under the modified plain-error test, appellant must "establish both that the misconduct constitutes error and that the error was plain." *Id*. A plain error is one that "contravenes case law, a rule, or a standard of conduct." *Ramey*, 721 N.W.2d at 302. If appellant establishes plain error, the burden shifts to the state to demonstrate that the error did not affect appellant's substantial rights. *Carridine*, 812 N.W.2d at 146.

We consider first whether an error occurred when the prosecutor made references to D.R.'s testimony during the closing argument. D.R. testified that she saw appellant "pull[] [R.W.'s] pants down" and "take his clothes." D.R. also stated that she saw a group of men, including appellant, "digging through" the clothes. D.R. recognized

9

appellant because she interacted with him earlier in the evening. During closing argument, the prosecutor stated that D.R.:

> [T]estified that she saw [appellant] going through the man's pockets, those shorts, going through those pockets. And, again, not only does she have a good vantage point in seeing what she saw and testifying about it, but remember, she had an encounter with him earlier in the evening.

Appellant argues that the prosecutor misstated D.R.'s testimony because D.R. did not specifically testify that she saw appellant going through R.W.'s pockets.[1]

The state argues that the misstatement does not constitute plain error affecting appellant's substantial rights because the inference is supported by the evidence. "In closing argument, a lawyer may present all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence." *State v. Pearson*, 775 N.W.2d 155, 163 (Minn. 2009). The prosecutor's characterization of D.R.'s testimony was not speculative. D.R. testified that appellant pulled off the victim's pants and took his clothes. D.R. also identified appellant as being in the group of men who dug through R.W.'s shorts. The prosecutor's statement is supported by a factual basis. *See id.* ("[A] lawyer may not speculate without a factual basis.").

Defense also argues that the prosecutor improperly alluded to appellant's failure to testify. During closing, the prosecutor stated:

> The law provides for a process for the guarantee of a fair trial in this country. And that fair trial involves a person being present when there's competent evidence put forth by the state as to what they did and what their guilt is. But the

---

[1] Another witness, T.G., testified that the group of men took off R.W.'s clothes and were "digging through them." T.G. also saw someone take a black wallet out of R.W.'s pants.

> law does not shield the guilty from the consequences of their acts. The law does not thwart justice.

Appellant argues that the statement about appellant's right to be "present" amounts to prosecutorial misconduct because it called the jury's attention to appellant's failure to testify.

Alluding in closing argument to a defendant's decision not to testify constitutes prosecutorial misconduct. *Ramey*, 721 N.W.2d at 300. Indirect references to a defendant's failure to testify are prohibited if they either "(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have understood them as a comment on defendant's failure to testify." *State v. DeRosier*, 695 N.W.2d 97, 107 (Minn. 2005). Here, the prosecutor's use of the word "present" fails under this test as it neither calls attention to appellant's failure to testify, nor is it likely that the jury "naturally" understood it as a comment on his failure to testify. Appellant has not satisfied the burden of establishing that an error occurred.

## IV.

With respect to the fourth argument, appellant claims that there was insufficient evidence to demonstrate beyond a reasonable doubt that he aided and abetted first-degree assault. Our review of the sufficiency of the evidence challenge is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *Id.* at 108 (quotation omitted). "Circumstantial evidence is entitled to the same weight as direct evidence so long as the circumstances proved are

11

consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Id*.

The state charged appellant with aiding and abetting assault in the first-degree in violation of Minn. Stat. §§ 609.221, subd. 1, 609.05, subd. 1 (2012). A person who "assaults another and inflicts great bodily harm" is guilty of first-degree assault. Minn. Stat. § 609.221, subd. 1. A person may be liable for the crimes of another "if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1. The phrase "intentionally aids" means: "(1) that the defendant 'knew that his alleged accomplices were going to commit a crime,' and (2) that the defendant 'intended his presence or actions to further the commission of that crime.'" *State v. McAllister*, ___ N.W.2d ___ (Minn. Apr. 8, 2015) (quoting *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012)). Because intent is a state of mind, it is "generally proved circumstantially—by drawing inferences from the defendant's words and actions in light of the totality of the circumstances." *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997).

Here, there is substantial direct and circumstantial evidence connecting appellant to the first-degree assault on R.W. Several witnesses, including D.R., identified appellant as the person who removed R.W.'s pants and took his clothes. Police investigators used photographs from a surveillance video on the bus to identify appellant as one of the individuals who may have been involved in the assault. When police officers went to appellant's house to speak with him, he attempted to climb out the back window to escape from the police. The police officers discovered a pair of tennis shoes and a pair of

jean shorts with blood-like stains on them inside appellant's home. The BCA confirmed that the shoes tested positive for blood and matched R.W.'s known DNA sample. A bloodstain-spatter analysis demonstrated that appellant was in the vicinity of an event that caused blood to splatter from R.W.'s head and onto appellant's shoes.

Appellant asserts that the evidence produced at trial was insufficient to support the verdict because he was merely "in proximity" to a "spontaneous event." Appellant attempts to distinguish the initial punch from the subsequent attack. During oral argument, the state agreed that the first strike was spontaneous, but argued that the attack that followed was intentional and fell within the definition of aiding and abetting first-degree assault. We agree, and determine that the record supports the jury's finding that appellant participated in a violent, ongoing, continued physical attack against R.W.

Appellant also argues that the evidence and the testimony could have been interpreted in alternate ways. But it is not within the scope of this court's review to reweigh the evidence and draw different conclusions. *See State v. Robinson*, 536 N.W.2d 1, 2 (Minn. 1995) (stating that appellate courts do not reweigh the evidence). The jury found appellant guilty on two counts and not guilty on the benefit-of-a-gang counts, suggesting that the jury carefully weighed the evidence in reaching its decision. The jury was in the best position to evaluate the credibility of witnesses and weigh the evidence, and we give its verdict due deference. *Cooper*, 561 N.W.2d at 179. Viewing the evidence in the light most favorable to the verdict, *DeRosier*, 695 N.W.2d at 108, the evidence supports the jury's guilty verdict.

13

**V.**

The next issue before this court is whether the district court erred in asking the sentencing jury for legal conclusions rather than soliciting specific factual questions. The district court sentenced appellant to a term of 196 months on the aiding and abetting first-degree assault conviction, which constituted a double upward durational departure from the guidelines sentence. The sentence was based on the sentencing jury's finding that two aggravating factors existed: (1) R.W.'s particular vulnerability, and (2) the participation of three or more persons in the offense.

Appellant argues that the jury's answers to the special interrogatories were not findings of fact and the district court did not adequately explain why those circumstances justified an upward departure. Appellant relies on *State v. Rourke*, which states that:

> [A] district court must submit to a jury the question of whether the State has proven beyond a reasonable doubt the existence of additional facts, which were neither admitted by the defendant, nor necessary to prove the elements of the offense, but which support reasons for departure. But the question of whether those additional facts provide the district court a reason to depart does not involve a factual determination and, therefore, need not be submitted to a jury.

773 N.W.2d 913, 921 (Minn. 2009).

As an initial matter, we note that appellant did not contest the jury's finding that three or more people participated in the attack against R.W. The district court properly relied on this aggravating factor during sentencing, and it is not challenged on appeal.

However, appellant argues that the district court asked the jury to make a legal determination that R.W. was particularly vulnerable due to reduced physical and mental

14

capacity, without finding facts to support it. Appellant did not object to the district court's special verdict form and we review for plain error. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998), *holding modified by Ramey*, 721 N.W.2d at 298-99. The three-prong plain-error test requires "(1) an error; (2) that is plain; and (3) the error affects the defendant's substantial rights." *Id.* If each of these three prongs is met, we assess whether to address the error to "ensure fairness and the integrity of the judicial proceedings." *Id.*

The state concedes that the district court committed plain error by not presenting a factual question, but contends that appellant cannot establish that his substantial rights were affected. We agree. The third prong is satisfied if the error is "prejudicial and affected the outcome of the case." *Id.* at 741. In assessing whether this prong is satisfied, this court considers "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007).

The state met its burden of demonstrating that the plain error did not affect appellant's substantial rights. Several witnesses testified that R.W. was struck in the head and fell to the ground. It is uncontested that R.W. did not get up again after being knocked to the ground and did not defend himself during the assault. There was also substantial evidence in the record that a group of men were kicking and stomping on R.W. once he was on the ground. At one point, a female witness laid on top of R.W. in an attempt to stop the assault. This assault continued for 5 to 15 minutes. The facts in

15

the record support the sentencing jury's determination that R.W. was particularly vulnerable and that appellant knew or had reason to know of this infirmity. Accordingly, we determine that the plain error did not prejudice appellant or affect the outcome of the case. *Griller*, 583 N.W.2d at 741.

## VI.

We last turn to appellant's argument that the district court abused its discretion in imposing a double upward durational departure. Appellant claims that there were no "substantial and compelling circumstances making appellant's conduct more serious than the typical offense." We review a district court's decision to depart from the presumptive sentence for an abuse of discretion. *Taylor v. State*, 670 N.W.2d 584, 588 (Minn. 2003).

A trial court may depart from the guidelines "only when substantial and compelling circumstances are present." *Id*. at 587. "Substantial and compelling circumstances are present when the defendant's conduct in the offense of conviction was significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Abrahamson*, 758 N.W.2d 332, 337-38 (Minn. App. 2008) (quotation omitted). Where the district court states its reasons for departure on the record, we determine if the reasons justify the departure; if they do, the departure will be allowed. *Id*. at 338.

Appellant claims that the district court "made no effort to compare appellant's conduct to the conduct present in other first-degree assault cases." The district court relied on two aggravating factors warranting an upward departure: R.W.'s vulnerability

16

and the large number of people participating in the assault.  The district court concluded

that:

> [R.W.] was particularly vulnerable in that he was lying unconscious on the ground as people continued to pull on him and kick him and cause him perhaps even more serious injury than he had already received from the first blow when he was blindsided from behind as he was reaching out trying to help one of the girls that was on the ground up off the ground. . . . Those are the specific reasons for the durational upward departure.

These reasons are neither improper nor inadequate and there is sufficient evidence

in the record justifying the district court's findings.  *Taylor*, 670 N.W.2d at 588.  We

determine that the district court did not err in imposing an upward durational departure.

**Affirmed.**