**STATE of Minnesota, Respondent,**

v.

**Juan Humberto Castillo–ALVAREZ, Appellant.**

**Nos. A11–1379, A12–0081.**

Court of Appeals of Minnesota.

Sept. 17, 2012.

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, MN; and Robert C. O'Connor, Jackson County Attorney, Jackson, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by CHUTICH, Presiding Judge; KALITOWSKI, Judge; and SCHELLHAS, Judge.

## OPINION

CHUTICH, Judge.

Appellant Juan Humberto Castillo–Alvarez challenges his convictions of kidnapping and second-degree intentional murder, contending that his prosecution in Minnesota violated his double-jeopardy rights under Minn.Stat. § 609.045 and the Minnesota Constitution. He also asserts that the district court erred in (1) admitting his unrecorded statement to law enforcement; (2) admitting hearsay statements without identifying the exception under which they were admissible; (3) imposing consecutive sentences and an upward durational departure without making required findings; and (4) ordering him to pay, as costs of prosecution, transcript costs and witness fees. Castillo–Alvarez makes several pro se arguments as well.

Because Castillo–Alvarez's prosecution did not violate his double-jeopardy rights and because the record is sufficient to support the district court's rulings on the hearsay and sentencing issues, we affirm the convictions and sentence. Concerning the payment of costs, we affirm the order for payment of all costs except the costs of preparing a pretrial transcript, which we reverse. We find Castillo–Alvarez's pro se contentions to be without merit, and we deny the state's motion to strike portions of Castillo–Alvarez's reply brief.

## FACTS

This case arises from the brutal kidnapping and murder in Minnesota of a 15–year–old boy, G.S.E., in June 1997. G.S.E. lived with his father in Estherville, Iowa, and became involved in using and selling drugs in Estherville and surrounding areas in about 1996. Castillo–Alvarez lived in Estherville at the time and owned a Mexican restaurant. He was also a drug dealer, and would "front" drugs to several street-level dealers, which they would then sell.[1]

In 1996, another drug dealer named Luis Lua, who associated with Castillo–Alvarez, fronted G.S.E. one pound of marijuana, for which G.S.E. was supposed to pay him $1,400 after selling the drugs. In late December 1996, however, police arrested G.S.E. after a traffic stop and seized the marijuana, and he was unable to pay Lua. Lua was upset not only because he did not get his money, but also because he, in turn, owed money to Castillo–Alva-

---

1. "Fronting" drugs essentially means that Castillo–Alvarez would give someone the drugs on a line of credit. That person would sell the drugs and pay Castillo–Alvarez his asking price. The person would then keep any profit above what he paid to Castillo–Alvarez.

rez. Castillo–Alvarez had fronted drugs to Lua and was pressuring Lua to repay his debt, which Lua could not do without the money that G.S.E. owed him.

In June 1997, a third drug dealer in Estherville, Aurelio Ortiz, gave G.S.E. $500 to buy Ortiz a half-ounce of methamphetamine, but G.S.E. was unable to get the drugs or to refund the $500. On June 5, 1997, Lua and two other men, Ben Alden and Shawn Knakmuhs, confronted G.S.E. about the money and drugs he owed Lua and Ortiz. Lua pulled out a pistol, pointed it at G.S.E., and told him that he had one day to get the rest of the drugs or the money that he owed Lua and Ortiz. G.S.E. gave the men some cocaine and methamphetamine, and they left. Lua and Ortiz became angry when they later discovered that G.S.E. had shorted them on the drugs.

The next day, June 6, 1997, Lua, Ortiz, and several other men went to Spencer, Iowa, where G.S.E. was staying, to confront him. The group had three guns, including a Lorcin .380 handgun, which Alden and Knakmuhs testified that Lua had received from Castillo–Alvarez.[2] When G.S.E. arrived at the apartment, Lua, Ortiz, and Knakmuhs took him at gunpoint into the bedroom, where they screamed at him, beat him up, and took all of the money in his pockets. At one point, the men held G.S.E. down on the bed while Lua put an unloaded gun in the teen's mouth and pulled the trigger. Lua told G.S.E. they were taking him to see "the man" and that G.S.E. "would be lucky if the man let him live." Lua pulled G.S.E. by the bill of his cap to walk him to the car, and told the terrified teen that "if he tried to run, [Lua] would shoot him."

Lua and some of the other men then drove G.S.E. to Castillo–Alvarez's restaurant in Estherville. G.S.E.'s hands were tied behind his back and Lua brought a pillow and pillow case. When they arrived at the restaurant, Castillo–Alvarez got into the car and spoke with Lua and G.S.E. for approximately five minutes.

Lua and four other men then drove G.S.E. to a secluded area on the outskirts of Estherville where they pulled G.S.E. out of the car, put the pillow case over his head, and took turns punching and kicking him while he was on the ground. G.S.E. could not fight back, as his hands were still tied behind his back. Lua pulled out a handgun and pointed it at G.S.E.'s head. One of the men, Ramiro Astello, asked Lua what he was doing, and Lua said that Castillo–Alvarez told him to kill G.S.E. and leave him somewhere in Minnesota.

Lua decided it was too risky to shoot the fifteen-year-old at their current location. He put a garbage bag over G.S.E.'s head down to his waist and the men put him in the trunk of the car so the teen would not get blood on the back seat. The group then drove to an abandoned farmhouse in Jackson County, Minnesota, where they marched G.S.E. into the basement. Lua put a bandana around the teen's mouth, and shot him in the head with the Lorcin .380 given to him by Castillo–Alvarez. Lua passed the gun to another companion, Ryan Wedebrand, who also shot G.S.E. A third man, Thomas Mann, also tried to shoot G.S.E., but the gun jammed. The group then left, leaving the teenager's body in the basement.

The next day, Lua and Knakmuhs returned to the farmhouse and tried to set it on fire so that G.S.E.'s body would not be identifiable. The fire burned part of the

**2.** Ramiro Astello testified that Lua stole the Lorcin from a gun show sometime in the winter before G.S.E.'s murder, filed off the serial number, and sold the gun to Castillo–Alvarez.

basement, but not the entire house. G.S.E.'s partly burned body was discovered one week later, on June 14, 1997. A short time later, police executed a search warrant for Castillo–Alvarez's restaurant in Estherville and discovered the Lorcin .380 hidden in a false ceiling; they later determined that the Lorcin was the murder weapon.

At some point after the teen's body was found, Castillo–Alvarez fled to Mexico. Federal and Iowa state charges had been filed shortly after the murder, but because the FBI was unable to extradite Castillo–Alvarez from Mexico, the charges were dismissed.[3] Castillo–Alvarez was located in Mexico in 2004, extradition proceedings were started again, and the State of Iowa re-charged him with second-degree murder, kidnapping, and conspiracy in connection with G.S.E.'s death. Mexican officials finally arrested Castillo–Alvarez and returned him to the U.S. in October 2006.

After Castillo–Alvarez arrived in Houston, Texas, FBI Agent Robert Birnie and the Clay County, Iowa sheriff flew to Texas to return him to Iowa. They conducted a custodial interrogation at the FBI office located at the Houston airport. Consistent with FBI policy and Texas and Iowa law, the officers were not required to electronically record the interrogation. During the interview, Castillo–Alvarez denied involvement with G.S.E.'s murder. He told Agent Birnie that he only told Lua to take G.S.E. to the country, beat him up, leave him naked, and let him walk into town. He denied telling Lua to kidnap or to kill G.S.E.

An Iowa jury found Castillo–Alvarez guilty of the Iowa charges in September 2007. The Iowa Court of Appeals reversed his convictions in September 2009, holding that the Iowa prosecution violated his speedy-trial rights. *State v. Castillo–Alvarez*, No. 08–0868, 2009 WL 2960419 (Iowa Ct.App. Sept. 2, 2009). The court did not address the sufficiency of the evidence at trial or any other issue beyond the speedy-trial issue.

In February 2010, Jackson County, Minnesota, the county in which G.S.E. was murdered, charged Castillo–Alvarez with two counts of aiding and abetting second-degree murder and one count of aiding and abetting kidnapping. He moved to dismiss on the grounds of double jeopardy and other alleged constitutional violations. He also sought to suppress his statements to Agent Birnie because they were not recorded as required by Minnesota law. The district court denied all of Castillo–Alvarez's motions, and the case went to trial. Three of the other men involved in the kidnapping and murder, Alden, Knakmuhs, and Astello, testified at trial consistent with the state's theory that Castillo–Alvarez was the one who ordered Lua to kidnap and to murder G.S.E., and that Lua was following Castillo–Alvarez's orders.[4]

---

**3.** Others involved in the kidnapping and killing were charged and convicted for their roles in the crimes. Lua pleaded guilty and was sentenced to life in prison. *See U.S. v. Ortiz*, 40 F.Supp.2d 1073, 1076 (N.D.Iowa 1999). An Iowa jury convicted Wedebrand, one of the shooters, of first-degree murder and first-degree kidnapping. He was sentenced to life imprisonment without parole. *See Wedebrand v. State*, No. 02–0568, 2003 WL 21543146, at *1 (Iowa Ct.App. July 10, 2003). Mann, who tried to shoot G.S.E. but the gun misfired, pleaded guilty to second-

degree murder in Iowa, and is serving an indeterminate term of incarceration not to exceed 50 years. *See State v. Mann*, 602 N.W.2d 785, 787–88 (Iowa 1999).

**4.** Alden pleaded guilty in federal court to conspiracy to commit kidnapping, and was sentenced to eight years in prison. Astello is serving a life sentence without parole for his involvement in the crimes. Knakmuhs pleaded guilty in federal court to conspiracy to commit kidnapping resulting in death and use

In January 2011, a jury found Castillo–Alvarez guilty on all counts. The district court then sentenced him to 48 months for kidnapping and 480 months for second-degree intentional murder, and ordered that the sentences be served consecutively. The court also ordered Castillo–Alvarez to pay certain costs of prosecution. This appeal followed.

### ISSUES

I. Did Castillo–Alvarez's prosecution in Minnesota, after his conviction in Iowa was reversed, violate his double-jeopardy rights under Minn.Stat. § 609.045 or under the Minnesota Constitution?

II. Did the district court err in admitting Castillo–Alvarez's unrecorded statements to the FBI agent and an Iowa law enforcement officer?

III. Did the district court abuse its discretion in admitting hearsay statements without making findings on the record that the statements were admissible as non-hearsay?

IV. Did the district court abuse its discretion by imposing consecutive sentences for Castillo–Alvarez's convictions and an upward departure on the murder conviction?

V. Did the district court err in ordering Castillo–Alvarez to pay transcript and witness costs under Minn.Stat. § 631.48 (Supp.2009)?

VI. Do any of Castillo–Alvarez's pro se arguments have merit?

### ANALYSIS

### I. Statutory and Constitutional Double Jeopardy

Castillo–Alvarez first contends that the Minnesota prosecution violated his statutory and constitutional rights to be free from

double jeopardy because Minnesota prosecuted him for the same offense after his Iowa conviction. We turn first to his claim that Minnesota's double-jeopardy statute bars a Minnesota prosecution.

### A. Minn.Stat. § 609.045

Castillo–Alvarez contends that his prosecution in Minnesota violated Minn.Stat. § 609.045 because he was already convicted in Iowa. Section 609.045 provides:

> If an act or omission in this state constitutes a crime under both the laws of this state and the laws of another jurisdiction, a conviction or acquittal of the crime in the other jurisdiction shall not bar prosecution for the crime in this state unless the elements of both law and fact are identical.

We thus consider whether the proceedings in Iowa, i.e., conviction and subsequent reversal with dismissal, constitute "a conviction or acquittal of the crime in the other jurisdiction" that would bar the Minnesota prosecution under section 609.045. The district court concluded that because Castillo–Alvarez's Iowa conviction was reversed, and the case dismissed, the conviction is a "legal nullity" and Minn. Stat. § 609.045 does not bar prosecution in Minnesota. We agree.

■■■ Statutory interpretation presents a question of law, which we review de novo. *State v. Fleck,* 810 N.W.2d 303, 307 (Minn.2012). Our first step in interpreting a statute is to "determine whether the statute's language, on its face, is clear or ambiguous. We construe words and phrases according to their plain and ordinary meaning. A statute is ambiguous only when the statutory language is subject to more than one reasonable interpretation." *Id.* (citations and quotations omitted). If we find that a statute is un-

of a firearm, and he received a 218–month sentence.

ambiguous, we apply the statute's plain meaning. *Id.*

■ We conclude that Minn.Stat. § 609.045 is not ambiguous. A "conviction" is defined as a guilty plea, or "a verdict of guilty by a jury or a finding of guilt by the court," that is accepted and recorded by the court. Minn.Stat. § 609.02, subd. 5 (2008). Section 609.045 contains no provision specifying whether prosecution is barred when a conviction in another jurisdiction later becomes a nullity, but we do not believe this omission renders it ambiguous. *See State v. Heiges,* 806 N.W.2d 1, 15 (Minn.2011) (concluding that legislative omission does not necessarily render a statute ambiguous and stating that "[i]n construing statutes, we cannot supply that which the Legislature purposely omits or inadvertently overlooks").

■ Applying the statute's plain meaning, Castillo–Alvarez's Minnesota prosecution is not barred by section 609.045. The Iowa appellate court "reverse[d] the district court's ruling and remand[ed] for the district court to dismiss the charges against" Castillo–Alvarez. *Castillo–Alvarez,* 2009 WL 2960419, at *6. Therefore, the appellate court's dismissal of the charges essentially erased the Iowa conviction because of the state's speedy-trial error, and no conviction existed at the time Minnesota filed its complaint against Castillo–Alvarez.

■ This reading is consistent with caselaw interpreting a similar statute, Minn.Stat. § 609.035, which provides that "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them." Minn. Stat. § 609.035, subd. 1 (2010). Our supreme court has held that, if a defendant's

conviction is set aside on appeal, it is "never a final conviction under [section 609.035] so as to bar the State's prosecution of the other offenses arising out of the same conduct." *State v. Spaulding,* 296 N.W.2d 870, 875 (Minn.1980). Thus, under section 609.035, reversal of a conviction does not bar further prosecution of offenses arising out of the same conduct, even though the statute does not expressly include language regarding reversal.

■ We now construe section 609.045 in the same way. Where a conviction has been overturned on appeal, at least for reasons other than insufficiency of evidence, no "conviction" of record bars further prosecution. *See Burks v. United States,* 437 U.S. 1, 15–18, 98 S.Ct. 2141, 2149–51, 57 L.Ed.2d 1 (1978) (holding that double jeopardy bars retrial when a reviewing court's reversal of a guilty verdict is because of insufficient evidence, but not when reversal is based solely on trial error).

This interpretation enables Minnesota to exercise its own sovereignty in "determining what shall be an offense against its peace and dignity." *Heath v. Alabama,* 474 U.S. 82, 89, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985) (quotation omitted). Here, the Iowa court reversed the convictions and dismissed the charges against Castillo–Alvarez, not because the evidence against him was insufficient, but because of a speedy-trial error that occurred when the Iowa prosecuting authority was trying to extradite Castillo–Alvarez from the foreign country to which he had fled. As a sovereign state, Minnesota has a legitimate interest in trying a person alleged to have ordered murder to occur within its boundaries; it would be unjust to allow the errors of another sovereign to prevent Minnesota from doing so here.

In sum, we conclude that when a conviction in another jurisdiction has been re-

versed on appeal for reasons unrelated to the sufficiency of the evidence, Minn.Stat. § 609.045 does not bar a second prosecution in Minnesota for the same conduct. Section 609.045 therefore does not bar Castillo–Alvarez's Minnesota prosecution.[5]

### B. Minnesota Constitution

We review double-jeopardy claims de novo. *State v. Leroy,* 604 N.W.2d 75, 77 (Minn.1999). The Minnesota Constitution provides that "no person shall be put twice in jeopardy of punishment for the same offense." Minn. Const. art. 1, § 7. This provision is essentially identical to the Double Jeopardy Clause of the United States Constitution. U.S. Const. amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"). "This prohibition protects a criminal defendant from 'three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense.'" *State v. Ehmke,* 752 N.W.2d 117, 121 (Minn.App. 2008) (quoting *State v. Humes,* 581 N.W.2d 317, 320 (Minn.1998)).

Castillo–Alvarez forthrightly acknowledges that no federal double jeopardy violation exists. It is well-settled that the Double Jeopardy Clause of the United States Constitution does not bar successive prosecutions by two states for the same conduct, even when a first prosecution by one state results in an actual *conviction* and sentence of a defendant, and the second state later charges and convicts the defendant of the *same offense. See Heath,* 474 U.S. at 88, 106 S.Ct. at 437 (finding no Double Jeopardy Clause violation when Georgia and Alabama both convicted a husband of murder when he hired men to kidnap his wife in Alabama, and she was murdered in Georgia).

Unless we hold that the Minnesota Constitution provides more protection than the identically worded federal Constitution, as Castillo–Alvarez urges us to do, his claim fails. Given the circumstances of this case, we decline to expand Minnesota's double-jeopardy protection beyond that provided by federal law for the following reasons.

First, while noting that "[i]t is axiomatic that a state supreme court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution," *State v. Fuller,* 374 N.W.2d 722, 726 (Minn.1985), the Minnesota Supreme Court has never expressly broadened Minnesota's double-jeopardy provision to provide greater protection than its federal counterpart. *See id.* at 727 ("We do not believe that this is an appropriate case in which to decide whether the double jeopardy clause of the Minnesota Constitution gives a criminal defendant greater protection than the federal constitution...."); *see also State v. Jeffries,* 806 N.W.2d 56, 61 n. 2 (Minn. 2011) (drawing no distinction between the Minnesota and federal double-jeopardy provisions and, "[f]or ease of reference, ... refer[ring] to both clauses collectively as 'the Double Jeopardy Clause'"). Because the Minnesota Supreme Court has declined specific invitations in the past to expand the double jeopardy protections of the Minnesota Constitution beyond those of the federal Constitution, we will not lightly do so here.

Second, the Minnesota Supreme Court has cautioned that it will not "cavalierly construe our constitution more expansive-

---

**5.** Because we conclude that there was no "conviction" to bar Castillo–Alvarez's prosecution, we need not address the parties' argu-

ments about whether the elements of the crimes charged in Iowa and Minnesota were identical in law and fact.

ly" than the federal Constitution, and that an interpretation by the United States Supreme Court of a "textually identical" provision of the federal constitution "is of inherently persuasive, although not necessarily compelling, force." *Fuller,* 374 N.W.2d at 726–27. Here, where the double-jeopardy provisions of the Minnesota and United States Constitutions are identical, *see id.* at 727, the interpretation in *Heath* should govern unless the United States Supreme Court "has made a sharp or radical departure from its previous decisions or approach to the law and … we discern no persuasive reason to follow such a departure." *See Kahn v. Griffin,* 701 N.W.2d 815, 828 (Minn.2005).

■ Third, consideration of the "nonexclusive list of factors" that our supreme court has stated "should prove useful" when "addressing an issue that may implicate a separate independent analysis under the Minnesota Constitution" does not persuade us that a broader interpretation of the Minnesota Constitution is warranted here. *Id.* at 829. These factors include:

(1) [T]he text of the state Constitution, (2) the history of the state constitutional provision, (3) relevant state case law, (4) the text of any counterpart in the U.S. Constitution, (5) related federal precedent and relevant case law from other states that have addressed identical or substantially similar constitutional language, (6) policy considerations, including unique, distinct, or peculiar issues of state and local concern, and (7) the applicability of the foregoing factors within

the context of the modern scheme of state jurisprudence.

*Id.*

Castillo–Alvarez cites *Kahn* to contend that "language, concerns, and traditions unique to Minnesota" justify providing greater protection under Minnesota's Constitution. *See id.* at 825. Specifically, he asserts that "Minnesota has a long tradition of providing to people greater double-jeopardy protections than those afforded by the federal constitution," and points to Minn.Stat. §§ 609.035, 609.04, and 609.045 as examples of this greater protection. Next, he argues that the placement of the double-jeopardy clause in the Bill of Rights of the Minnesota Constitution suggests that this individual right necessarily takes precedence over the state's interest in punishing offenses committed within its borders. Finally, Castillo–Alvarez contends that "construing the Minnesota Constitution to bar prosecution in this situation would be in accordance with the norm in 1857 when the Minnesota Constitution was adopted."

■ Applying the *Kahn* principles to these contentions, we conclude that the Double Jeopardy Clause of the Minnesota Constitution does not bar Minnesota's trial of Castillo–Alvarez. As noted ·above, the first and fourth *Kahn* factors weigh in favor of reading Minnesota's clause in conformity with the federal clause as they use identical language. While we safeguard the individual rights articulated in the Bill of Rights of the Minnesota Constitution, we are not persuaded that the mere placement of the double-jeopardy clause in that section necessarily grants it priority over other later provisions enumerating the powers of the government.[6]

---

**6.** Castillo–Alvarez cites *State v. Lessley,* 779 N.W.2d 825 (Minn.2010), to assert that the placement of the double-jeopardy provision mandates its priority over later provisions granting powers to the state. We do not read *Lessley* so broadly.

*Lessley* involved whether the jury-trial-waiver provision in the Minnesota Constitution required the state's consent before a criminal defendant could waive his right to a jury trial. *Id.* at 828. In holding that the clause did not require the state's consent, the supreme court

■ Nor are we convinced by the argument, pertaining to the second *Kahn* factor, that courts in 1857 disfavored or prohibited dual-sovereignty prosecutions, and therefore the framers of the Minnesota Constitution intended to prohibit dual prosecutions in different jurisdictions for the same conduct. While Castillo-Alvarez's assertions about double jeopardy in 1857 may be true, courts and legislatures have significantly developed the law on double jeopardy since that time and have expressly approved dual-sovereignty prosecutions. *See Heath,* 474 U.S. at 88, 106 S.Ct. at 437; *Westfall v. United States,* 274 U.S. 256, 258, 47 S.Ct. 629, 629, 71 L.Ed. 1036 (1927). In fact, it appears that Minnesota caselaw, the third *Kahn* factor, has recognized the dual sovereignty doctrine for many years.[7] *See State v. Fredlund,* 200 Minn. 44, 50, 273 N.W. 353, 356 (1937) ("But neither in the federal nor in our own constitution is there any prohibition against successive prosecutions if the wrongful *act* is the cause of separate and distinct *offenses.* Thus a single act may violate laws of different jurisdictions.").

■ Related federal caselaw, pertaining to the fifth *Kahn* factor, shows that reprosecution is allowed following a reversal on speedy-trial grounds. *See, e.g., Heath,* 474 U.S. at 88, 106 S.Ct. at 437; *United States v. Winters,* 491 F.3d 918, 920 (8th Cir.2007) (finding no double jeopardy claim where a defendant was prosecuted in federal court after his Iowa conviction for the same crime was reversed on speedy-trial grounds). Castillo-Alvarez has presented no compelling evidence or argument that *Heath* is a "sharp, radical, and unwarranted departure from the double-jeopardy rights previously afforded to the people," as he suggests. *See Kahn,* 701 N.W.2d at 828.

■ Nor do we believe that *Kahn*'s sixth factor, concerning policy considerations or Minnesota's unique traditions, requires us to interpret the Minnesota Constitution more broadly than the federal counterpart. We do not disagree with Castillo-Alvarez's assertion that certain Minnesota statutes expand double-jeopardy protection beyond that provided under federal law. *See State v. Jackson,* 363 N.W.2d 758, 760 (Minn.1985) (stating that section 609.04, which addresses lesser-included offenses, "expressly prohibits multiple convictions which might not be prohibited by the [federal] Double Jeopardy Clause"); *State v. Johnson,* 273 Minn. 394, 399–400, 141 N.W.2d 517, 522 (1966) (discussing section 609.035 and concluding that the purpose of the statute is "not only to protect against double punishment but also

discussed the clause's placement in the Bill of Rights. *Id.* at 833–34, 840. The court did not hold that the clause's placement spoke to its priority over other provisions of the constitution, as Castillo-Alvarez suggests, but rather that its placement in the Bill of Rights suggested that it did not grant any rights *to the state. Id.* at 834 ("Based on the placement of [the jury-trial-waiver clause] in the Bill of Rights article of the Minnesota Constitution and given the purpose of Minnesota's Bill of Rights, it would be counter-intuitive for us to construe the [clause] as granting rights to the State as opposed to reserving rights to the people.").

7. In addition, the Minnesota Supreme Court has stated that a defendant can be re-tried in this state even if his previous conviction in Minnesota has been overturned. Although not the holding of the case, the supreme court in *Jeffries* noted that "because the Double Jeopardy Clause protects against a second prosecution for the same offense after conviction, a conviction precludes further prosecution *unless a defendant has his conviction overturned.*" 806 N.W.2d at 61 n. 3 (quotations and citations omitted) (emphasis added). Thus, had Castillo-Alvarez's first prosecution been in Minnesota and his conviction later overturned, Minnesota law would not bar a second Minnesota prosecution.

to broaden the protection afforded by our constitutional provisions against double jeopardy").

Simply because these statutes expand double-jeopardy protection in Minnesota, however, does not lead us to conclude that we can or should broaden that protection even further by constitutional interpretation. If anything, these statutes suggest to us that expansion of double-jeopardy protection has historically come from the legislature, and not the courts, and that further constitutional expansion is unnecessary here. Moreover, recognizing the doctrine of separate sovereigns protects Minnesota's strong interest in ensuring that justice is done for those murdered within its borders, and that another sovereign's errors in adhering to its unique speedy trial rules do not prevent Minnesota from trying one alleged to have violated its laws.

■■■ In sum, we see no reason, on the record before us, to expand Minnesota's double-jeopardy prohibition to provide broader protections than those in the federal Constitution. The U.S. Supreme Court's decision in *Heath* is clear that dual prosecutions in different states are allowed, and Minnesota courts have not previously broadened double-jeopardy protection beyond that provided by federal law. Moreover, because Castillo–Alvarez's Iowa convictions were dismissed, he is not subject to multiple punishments,[8] which is one of the key abuses that the double-jeopardy prohibition seeks to prevent. *See Ehmke,* 752 N.W.2d at 121. We conclude, therefore, that when a defendant's conviction in another jurisdiction has been overturned on appeal, for reasons unrelated to sufficiency of the evidence, the double-jeopardy clause of the Minnesota Constitution does not bar a subsequent prosecution in Minnesota for the same offense.

## II. Admission of Unrecorded Statements

Castillo–Alvarez next challenges the district court's admission of the unrecorded statements he made to FBI agent Birnie at the Houston airport, after being extradited from Mexico in 2006. The state counters that no recording of this interrogation was necessary as it occurred outside of Minnesota. Given previous precedent, we agree that Minnesota's recording requirement does not apply to this custodial interrogation.

■■■ Under *State v. Scales,* all custodial interrogations conducted in Minnesota must be electronically recorded, if feasible, "including any information about rights, any waiver of those rights, and all questioning." 518 N.W.2d 587, 592 (Minn. 1994). If the interrogation occurs at a place of detention, recording is mandatory. *Id.* If a violation of this recording requirement is "substantial," any statements made by the suspect during the interrogation must be suppressed at trial. *Id.* To analyze whether a *Scales* violation has occurred, we determine whether *Scales* applies to the facts, and then, if so, whether the violation was substantial. *State v. Inman,* 692 N.W.2d 76, 80–81 (Minn.2005).

■■■ "Whether an officer's failure to record a custodial interrogation is a substantial violation of the *Scales* recording requirement is a legal question, subject to de novo review. Findings of historical fact by the ... district court[ ], however, are subject to a clearly erroneous standard of review." *Id.* at 79–80 (citation omitted).

■■■ Here, the parties agree about the pertinent underlying facts: this interroga-

---

8. In sentencing Castillo–Alvarez in this matter, the district court gave him jail credit for the time he had served in Iowa and Minnesota since his arrest in 2006.

tion was custodial; it was conducted by an FBI agent in Texas; it was unrecorded; and Texas, Iowa, and the FBI do not require electronic recording of custodial interrogations. In addition, when the interrogation occurred, Minnesota had not filed charges against Castillo–Alvarez, and the state was not otherwise active in the case.

In *State v. Sanders*, this court addressed the admissibility of statements taken by the FBI during an unrecorded custodial interrogation of a defendant at a detention center in Illinois. 743 N.W.2d 616 (Minn. App.2008). Noting that "the *Scales* recording requirement is a state procedural rule intended to govern conduct occurring within the state," this court concluded that the district court did not err by admitting the defendant's unrecorded statement. *Id.* at 620 ("Because the *Scales* requirement is not a part of either Illinois law or federal law, we conclude that the FBI did not willfully deviate from lawful conduct during the interrogation and that suppression of this evidence would not prevent future violations in Minnesota.").

The Minnesota Supreme Court granted review, but because it found that "the jury's verdict was surely unattributable to the district court's admission of [the unrecorded] testimony," it declined to decide whether the *Scales* requirement applied to a custodial interrogation conducted *outside* of Minnesota. *State v. Sanders*, 775 N.W.2d 883, 888–89 (Minn.2009). Because the supreme court did not expressly re-verse this court's holding on the out-of-state applicability of *Scales*, and has not otherwise addressed the issue, we must follow our decision in *Sanders*. *See State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn.App. 2010) (stating that the court of appeals "is bound by supreme court precedent and the published opinions of the court of appeals"), *review denied* (Minn. Sept. 21, 2010).

▮▮▮ In sum, *Scales* does not apply to this custodial interrogation conducted outside of Minnesota. The district court thus properly admitted Castillo–Alvarez's unrecorded statement.[9]

### III. Hearsay

Castillo–Alvarez next contends that the district court abused its discretion in admitting certain hearsay statements. Castillo–Alvarez's counsel objected after each of these statements, asserting hearsay and denial of the right to confrontation. The district court overruled each objection without explanation; at no time during the trial did defense counsel ask for an explanation of the rulings or request that the court make specific findings about whether they were non-hearsay statements of co-conspirators.[10]

The challenged testimony by Alden, Astello, and Knakmuhs involved statements that Lua made to each man before and during the kidnapping and murder of the teenager. They implied or stated that:

---

9. Even if the *Scales* recording requirement applies to interrogations conducted outside of Minnesota, we would conclude, under the circumstances present here, that the violation was not so substantial as to require suppression of the statement. *See Inman*, 692 N.W.2d at 80 n. 3.

10. In fact, the first time that Castillo–Alvarez specifically asserted that the district court erred in failing to make required co-conspira-

tor findings—that a conspiracy existed and that the statement was made in the course and furtherance of the conspiracy—was in his reply brief to this court. Despite this questionable timing, given our rulings below, we deny the state's motion to strike Castillo–Alvarez's reply-brief arguments as to the existence of a conspiracy and whether the statements were made in the course and furtherance of any conspiracy.

Lua was upset with G.S.E. for not paying Lua because Lua, in turn, owed money to Castillo–Alvarez; after G.S.E. was arrested in December 1996, Castillo–Alvarez worried that G.S.E. would tell the police about him; Castillo–Alvarez was angry with Lua for not paying his debt and pressured Lua; after the kidnapping but before the murder, Castillo–Alvarez wanted to talk to G.S.E. about his debt; and Castillo–Alvarez instructed Lua to kill G.S.E. and gave him the Lorcin .380 murder weapon.

■ The district court's evidentiary rulings will not be reversed absent a clear abuse of discretion. *State v. Flores,* 595 N.W.2d 860, 865 (Minn.1999) (reviewing the district court's hearsay ruling). Castillo–Alvarez argues that the district court improperly admitted these statements because it did not explain its rulings or identify on what theory it was admitting the evidence. "Generally, hearsay evidence is inadmissible unless it comes within a recognized exception." *State v. DeRosier,* 695 N.W.2d 97, 104 (Minn.2005) (citing Minn. R. Evid. 802).

■ After carefully reviewing the record, including the transcript of the pretrial hearing on the parties' motions in limine, the proceedings show that the district court admitted this testimony as statements of co-conspirators, which are not hearsay under Minnesota Rule of Evidence 801(d)(2)(E). To be sure, the state did not specifically identify before trial each statement it would seek to admit as a non-hearsay co-conspirator statement, but the prosecutor and defense counsel argued at the motion-in-limine hearing about whether such statements should come in under rule 801(d)(2)(E). Neither side identified

any other hearsay exception that might apply to the statements. Further, in reserving its ruling on the admissibility of the statements, the district court explicitly stated that the statements at issue were those made by co-conspirators.[11]

For a co-conspirator statement to be admitted, rule 801(d)(2)(E) provides that, "there must be a showing, by a preponderance of the evidence, (i) that there was a conspiracy involving both the declarant and the [defendant], and (ii) that the statement was made in the course of and in furtherance of the conspiracy." Minn. R. Evid. 801(d)(2)(E). The rule further states:

> In determining whether the required showing has been made, the Court may consider the declarant's statement; provided, however, the declarant's statement alone shall not be sufficient to establish the existence of a conspiracy for purposes of this rule. The statement may be admitted, in the discretion of the Court, before the required showing has been made. In the event the statement is admitted and the required showing is not made, however, the Court shall grant a mistrial, or give curative instructions, or grant the party such relief as is just in the circumstances.

*Id.*

The supreme court has recently explained that, "to admit out-of-court statements as co-conspirator non-hearsay, two things must be shown. First, the statements must satisfy the requirements of Minn. R. Evid. 801(d)(2)(E). Second, the introduction of the statements must not violate the Confrontation Clause of the Sixth Amendment." *State v. Larson,* 788 N.W.2d 25, 36 (Minn.2010) (footnote omitted); *see also State v. Brist,* 812 N.W.2d

11. In its written order on the motions in limine, the district court stated: "The State's request to permit introduction into evidence of certain statements made by co-conspirators is RESERVED for trial."

51, 54 (Minn.2012). The parties' dispute here relates solely to the first showing under Minn. R. Evid. 801(d)(2)(E).

▮▮▮ No Minnesota caselaw directly requires the district court to state in writing or on the record its finding that the requisite showings have been made under rule 801(d)(2)(E).[12] While explicit findings under the rule would have been helpful in this case, and we strongly encourage them in other cases, an examination of the entire record shows facts that support the district court's implicit findings that a conspiracy existed and that these challenged statements were made in the course of, and in furtherance of, the conspiracy. *See State v. Thompson,* 273 Minn. 1, 17, 139 N.W.2d 490, 503 (1966) ("Where an examination of the record as a whole shows facts from which the trial court could reasonably infer the existence of a conspiracy, the case ought not to be reversed because proof of the conspiracy came at the wrong time."). On this record, given the parties' pretrial discussions about admission of co-conspirator statements under rule 801(d)(2)(E), the district court's determination that the admissibility of the statements of co-conspirators would be determined at trial, and the lack of inquiry by defense counsel when the court overruled his general hearsay trial objections, we cannot say that the district court abused its discretion in admitting these statements.

▮▮▮ Even if admission of these statements was improper, however, any error was harmless beyond a reasonable doubt. *DeRosier,* 695 N.W.2d at 106. "[A]ppellate courts must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt." *Id.* (citation omitted).

The jury had ample evidence before it to convict Castillo–Alvarez of G.S.E.'s kidnapping and murder, even in the absence of the challenged statements. It heard the testimony of Astello, who was present during the kidnapping and murder. He testified that the day after the murder, he confronted Castillo–Alvarez and asked if it was true that Castillo–Alvarez and Lua had a plan to kill G.S.E. Castillo–Alvarez told Astello that it was true and that he had not told Astello of the plan earlier because he was afraid that Astello and the others would not go along with the plan and help Lua kill G.S.E.

According to Astello, Castillo–Alvarez told him that "[Castillo–Alvarez] wanted [G.S.E.] beaten and killed afterwards and dropped somewhere in Minnesota." Castillo–Alvarez told Astello that he wanted G.S.E. killed so that he would not "rat on" Castillo–Alvarez and because G.S.E. owed him money. Astello also testified that Castillo–Alvarez told him that he wanted the men to get rid of the shell casings, to crush G.S.E.'s skull, and to burn down the farmhouse.

In addition, Astello testified that Castillo–Alvarez told him that the murder weapon was hidden in his restaurant. Astello testified that, after the gun was found, Castillo–Alvarez asked him for rides to gather his things because he needed to get out of town and go to Mexico. The jury

---

**12.** In other contexts, the Minnesota rules of evidence and caselaw require such findings. For example, in determining whether a witness can be impeached by evidence that he or she has been convicted of a crime, "The trial judge should make explicit findings on the record as to the factors considered and the reasons for admitting or excluding the evidence." Minn. R. Evid. 609(a) 1989 comm. cmt.; *see also State v. Swanson,* 707 N.W.2d 645, 654–55 (Minn.2006).

could have reasonably credited Astello's properly-admitted testimony, and it amply supports the guilty verdict.

Further, the jury heard Agent Birnie's testimony about his interrogation of Castillo–Alvarez after he was extradited from Mexico in 2006. Although he denied involvement in the kidnapping and murder, Castillo–Alvarez admitted to Agent Birnie that Lua and two other men had come to his restaurant in Estherville and they had "the kid" with them. He told the agent that "the kid" had a pillow case over his head, and that "the kid" had been beaten up. Castillo–Alvarez admitted that he told Lua to take "the kid" out into the country, beat him up, and leave him naked.

The jury also heard the testimony of G.C., who was Castillo–Alvarez's cellmate for two or three months in 2007, when Castillo–Alvarez was jailed for the Iowa charges. G.C. testified that Castillo–Alvarez told him that he was in jail for the death of a young person who had failed to pay Castillo–Alvarez for drugs he had "fronted." According to C.G., Castillo–Alvarez told him "that after the deadline after the debt the youngster was suppose[d] to pay him the money, that this youngster did not pay him, and since he also knew a lot about the … drug business that he had to have him killed." Castillo–Alvarez also told G.C. that "he had given orders that [the youngster] would [be] beaten and killed." Castillo–Alvarez also admitted fleeing to Mexico after the murder "when he noticed the police were acting weird."

In addition, the jury heard testimony from law-enforcement officers about their execution of a search warrant at Castillo–Alvarez's restaurant in Estherville on June 18, 1997, shortly after G.S.E.'s body was discovered. During that search, officers found the Lorcin .380, later determined to be the murder weapon, hidden in a suspended ceiling.

We conclude that the admission of the challenged statements, even if they were not properly admitted as non-hearsay co-conspirator statements, was harmless beyond a reasonable doubt. While the statements tied Castillo–Alvarez to the kidnapping and murder, other admitted testimony and evidence amply supported the jury's necessary finding that the crimes were carried out on Castillo–Alvarez's direct orders. Therefore, the jury's verdict was "surely unattributable" to any error and we decline to reverse Castillo–Alvarez's convictions on the basis of any improperly admitted testimony.

### IV. Sentencing

The district court sentenced Castillo–Alvarez to 48 months for the kidnapping conviction and 480 months for the second-degree murder conviction, to be served consecutively. He contends that the district court erred in sentencing him because it (1) imposed consecutive sentences without stating reasons for the departure on the record, (2) failed to explain the reasons for the upward durational departure on the murder sentence, and (3) imposed a durational departure and consecutive sentences without finding severe aggravating factors.

#### A. Consecutive Sentences

"Whether consecutive sentences should be imposed is a question within the discretion of the district court." *State v. Branson,* 529 N.W.2d 1, 4 (Minn. App.1995), *review denied* (Minn. Apr. 18, 1995). We will not interfere with a district court's sentencing decision "unless the sentence is disproportionate to the offense or unfairly exaggerates the criminality of the defendant's conduct." *State v. McLaughlin,* 725 N.W.2d 703, 715 (Minn.2007) (quotations omitted).

The state correctly points out that a defendant may be convicted of and punished for both kidnapping and "any other crime committed during the time of the kidnapping." Minn.Stat. § 609.251 (1996); *see also State v. Swanson*, 498 N.W.2d 435, 440 (Minn.1993). Sentences for these convictions are presumed to be concurrent. *State v. Butterfield*, 555 N.W.2d 526, 532 (Minn.App.1996), *review denied* (Minn. Dec. 17, 1996).

The district court imposed consecutive sentences for the kidnapping and murder convictions, stating "[t]he Court finds that this matter is a permissive consecutive sentence that ... is not a departure and believes it would not unduly or unfairly exaggerate Mr. Castillo[-Alvarez]'s criminal conduct in this matter." Castillo–Alvarez contends that consecutive sentencing is a departure that requires findings of "aggravating circumstances," citing *State v. Halvorson*, 506 N.W.2d 331, 340 (Minn.App.1993).

*Halvorson* addressed a different version of the sentencing guidelines, however. Critically, the Sentencing Guidelines were amended effective August 1, 1996, to explicitly allow permissive consecutive sentences for "[m]ultiple current felony convictions for crimes *against persons*," which "may be given without departure." Minn. Sent. Guidelines II.F (1996) (emphasis added). This guideline was in place at the time of Castillo–Alvarez's offense and it

applies to his situation.[13] Thus, the district court did not err in imposing consecutive sentences without stating reasons for departure.

## B. Upward durational departure

Castillo–Alvarez next contends that the district court erred in failing to explain the reasons for the upward durational departure on the murder sentence, from the presumptive sentence of 306 months to 480 months, the statutory maximum sentence for second-degree murder in Minnesota. Specifically, he contends that the court did not adequately explain its decision to depart because it essentially repeated verbatim the jury's findings from the special verdict form.[14] We conclude that the district court did not err in imposing an upward durational departure because Castillo–Alvarez committed the offenses as part of a group of three or more.

Whether a stated reason for departure is proper is a legal determination that we review de novo. *Dillon v. State*, 781 N.W.2d 588, 595 (Minn.App. 2010), *review denied* (July 20, 2010). "[A]bsent a statement of the reasons for the sentencing departure placed on the record at the time of sentencing, no departure will be allowed." *State v. Geller*, 665 N.W.2d 514, 517 (Minn.2003). "An upward departure will be reversed if the sentencing court's articulated reasons for the departure are improper or inadequate and

---

**13.** When sentencing, the district court must apply the sentencing guidelines in effect at the time of the offense. Minn. Sent. Guidelines III.G (2010).

**14.** In the special verdict form, the jury answered the following questions in the affirmative:

 1. Was [G.S.E.] subjected to verbal threats, hit and kicked, for which the defendant should be held responsible?

 2. Was [G.S.E.] threatened with a gun and a gun shoved in his mouth, for which the defendant should be held responsible?
 3. Were [G.S.E.]'s hand[s] tied and his mouth gagged with a bandana, for which the defendant should be held responsible?
 4. Was [G.S.E.] placed in a car trunk with a bag covering his head and upper body, for which the defendant should be held responsible?
 5. Did the defendant commit the crimes as part of a group of three or more persons who all actively participated in the crimes?

the evidence in the record is insufficient to justify the departure." *Tucker v. State,* 799 N.W.2d 583, 586 (Minn.2011) (quotations omitted).

■ The state sought an upward departure based upon the aggravating factors of treating the victim with "particular cruelty for which the individual offender should be held responsible" and committing the crime "as part of a group of three or more persons who all actively participated in the crime." *See* Minn. Sent. Guidelines II.D.2.b(2), (8) (1996). Because the record shows that the district court did not explain why the aggravating facts found by the jury concerning particular cruelty present a substantial and compelling reason to depart from the guidelines, it could not rely upon this aggravating factor to depart from the presumptive sentence. *See State v. Rourke,* 773 N.W.2d 913, 919–21 (Minn.2009).

■ Unlike the particular cruelty factor, however, under the "group of three or more" factor, the facts supporting departure and the reason supporting departure are indistinguishable. No purpose is served by requiring the district court to separately state on the record that the factor is a reason for departure. Because of the nature of this aggravating factor, we conclude that the district court's failure to "explain" this factor did not preclude the court from using it as a reason for departure.

■ While it would be inappropriate for us to remand the case to allow the district court to explain its reasons on particular cruelty after the fact, *see Geller,* 665 N.W.2d at 517, we conclude that the "group of three or more" factor properly supports the departure and the district court would have "imposed the same sentence absent reliance upon the improper aggravating factor[ ]." *State v. Mohamed,*

779 N.W.2d 93, 100 (Minn.App.2010) (quotation omitted), *review denied* (Minn. May 18, 2010). An upward departure may be supported based on the presence of a single aggravating factor. *State v. O'Brien,* 369 N.W.2d 525, 527 (Minn.1985) (stating that the presence of a single aggravating factor is sufficient to support upward departure); *see also Dillon,* 781 N.W.2d at 599 (same).

■ This kidnapping and murder of a 15–year–old boy was a brutal crime, in which Castillo–Alvarez actively participated with at least three other people. While he did not pull the trigger himself, by instructing others to kidnap and to kill G.S.E., he is directly responsible for his murder. We do not believe that the 480–month sentence for the murder conviction is disproportional to the offense. *See State v. Anderson,* 356 N.W.2d 453, 454 (Minn. App.1984) (stating that where the record supports the finding that an aggravating factor provides substantial and compelling reasons to depart, an appellate court "will not modify the departure unless it has a 'strong feeling' that the sentence is disproportional to the offense"). Nor does the sentence unfairly exaggerate the criminality of Castillo–Alvarez's conduct. *See McLaughlin,* 725 N.W.2d at 715.

Because the "group of three or more" aggravating factor is sufficient to support the district court's upward departure on the murder sentence, the district court did not abuse its discretion in imposing an upward durational departure, and we affirm the departure. *See Dillon,* 781 N.W.2d at 596 ("We have found no cases in which an appellate court has held that adequate grounds to depart exist but that the district court abused its discretion by extending the sentence up to twice its presumptive term.").

### C. Severe Aggravating Factors

 Finally, Castillo–Alvarez contends that the district court erroneously imposed the upward durational departure and consecutive sentences without finding severe aggravating factors. To be sure, aggravating factors may support a durational departure or a consecutive sentence, *State v. Rachuy*, 502 N.W.2d 51, 52 (Minn. 1993), but the district court must find severe aggravating factors to impose both. *See Halvorson*, 506 N.W.2d at 340. Because we conclude above, however, that imposing consecutive sentences was *not* a departure under the guidelines, the district court was not required to find "severe" aggravating circumstances to support these sentences.[15]

In sum, the district court properly imposed an upward durational departure on Castillo–Alvarez's second-degree murder sentence, and also properly imposed consecutive sentences for the two convictions. We affirm the sentences.

### V. Costs of Prosecution

 Minnesota's costs-of-prosecution statute provides that "[i]n a criminal action, upon conviction of the defendant, the court may order as part of the sentence that defendant shall pay the whole or any part of the disbursements of the prosecution." Minn.Stat. § 631.48. We review de novo whether a certain cost is allowed under this statute. *State v. Lopez–Solis*, 589 N.W.2d 290, 292 (Minn.

1999). "If particular costs sought are recoverable under the criminal prosecution costs statute, a trial court's award will not be reversed absent a clear abuse of discretion." *Id.* "The costs allowed [under section 631.48] must either be expressly provided for in the statute or analogous to costs taxable to the prevailing party in a civil action." *Id.* at 293; *see* Minn.Stat. § 549.04 (2010) (allowing disbursements to the prevailing party in a civil action).

Castillo–Alvarez argues that the district court erred in ordering him to reimburse the state for (1) the cost of preparing a transcript of the omnibus hearing and (2) out-of-state travel expenses for witness Patricia Wojtowicz.

### A. Transcript

 The district court found that the state could recover the costs of preparing the omnibus-hearing transcript. The court likened the transcript to an exhibit, the costs of which are recoverable in both civil and criminal cases. *See* Minn.Stat. § 357.315 (2010) (civil); *Lopez–Solis*, 589 N.W.2d at 296 (criminal).

We have found no criminal cases addressing the recoverability of transcript costs under section 631.48. The district court cited section 357.315, applicable in civil cases, which states that "[t]he costs of obtaining medical records used to prepare a claim, whether or not offered at trial, and the reasonable costs of exhibits shall be allowed in the taxation of costs." Yet

---

**15.** Castillo–Alvarez cites *State v. Hearn*, 647 N.W.2d 27 (Minn.App.2002), *vacated and remanded on other grounds* (Minn. Mar. 30, 2004), to assert that, regardless of the language of section II.F.2 in place when his offenses occurred in 1997, imposition of consecutive sentences and an upward durational departure on the murder charge is still a departure. *Hearn* is inapposite, however, because it was based on the language of the sentencing guidelines effective on the date of the offense in *Hearn*.

The *Hearn* court cited Minn. Sent. Guidelines comment II.F.04 (1999), which stated that additional aggravating factors are required to impose consecutive sentences on top of a durational departure. 647 N.W.2d at 33. This commentary was added to the sentencing guidelines effective August 1, 1998, *after* Castillo–Alvarez's offense, and is therefore not instructive in analyzing his sentence. *Cf.* Minn. Sent. Guidelines cmt. II.F.04 (Supp. 1997).

this transcript was obviously not a medical record, and it is undisputed that it was not used as an exhibit at trial. Moreover, the modifier "whether or not used at trial" in section 357.315 appears to apply only to medical records, rather than all exhibits.

■ We conclude, therefore, that under Minn.Stat. § 631.48, the district court may not order the defendant to pay the costs of preparing a transcript, when that transcript is not used as an exhibit at trial. We reverse the district court's order that Castillo–Alvarez pay $918 for the cost of preparing a transcript of the omnibus hearing.

### B. Witness Travel Expenses

■ The district court also ordered Castillo–Alvarez to pay witness Patricia Wojtowicz's travel expenses, finding that she was an expert witness at trial. Castillo–Alvarez concedes that fees incurred for expert testimony, including travel costs, are recoverable, and are discretionary with the district court. *See* Minn.Stat. § 357.25 (2010); *Lopez–Solis,* 589 N.W.2d at 295–96. He contends, however, that Wojtowicz was a lay witness, and therefore her expenses are limited to those incurred for travel within the state. *See* Minn.Stat. § 357.22(2) (2010).

■ Wojtowicz worked at the Minnesota Bureau of Criminal Apprehension in 1997, and conducted DNA tests on several items of evidence related to this case. She testified as to how DNA testing was done in general, and described the DNA tests on evidence in this case, particularly the Lorcin .380 murder weapon. Wojtowicz testified to her conclusion that the DNA on the gun matched G.S.E.'s DNA.

Given this testimony, we conclude that Wojtowicz testified mainly as an expert witness. *See Le Mere v. McHale,* 30 Minn. 410, 411, 15 N.W. 682, 682 (1883)

(describing an expert witness as one "who is admitted to testify from a peculiar knowledge of some art or science, a knowledge of which is requisite or of value in settling the point in issue"). Thus, the district court did not err in ordering Castillo–Alvarez to pay her out-of-state travel costs.

### VI. Pro Se Arguments

*Interpreter*

Castillo–Alvarez argues in his pro se brief that he was prejudiced by not having an interpreter during the interview with FBI Agent Birnie. We construe this argument as an assertion that his waiver of rights was not knowing, intelligent, and voluntary, but conclude that is it without merit.

■ A suspect who has difficulty speaking or comprehending English has the right to an interpreter during custodial interrogation. Minn.Stat. §§ 611.31, 611.32, subd. 2 (2010). "Findings of fact surrounding a claimed *Miranda* waiver are reviewed for clear error; legal conclusions based on those facts are reviewed de novo." *State v. Farrah,* 735 N.W.2d 336, 341 (Minn.2007) (discussing whether a waiver was valid where the defendant claimed he did not understand English well).

■ No error is present here where the district court found that Castillo–Alvarez was proficient in English, noted that he had translated for friends and family in the past, and found no indication that he "had any difficulty understanding or speaking English at any point during the recitation of the *Miranda* warnings or the interview." On this record, his waiver was knowing, intelligent, and voluntary.

*Extradition*

■ Castillo–Alvarez contends that his extradition from Mexico was in violation of

the U.S.-Mexico extradition treaty, specifically the doctrine of specialty. Because the Iowa court considered and rejected this argument, and because Castillo–Alvarez had a full and fair opportunity to litigate the issue in the Iowa proceeding, this challenge is precluded on the basis of collateral estoppel. *See Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn.2004); *see also Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn.1990) (holding that Minnesota does not require mutuality of parties "as a predicate to the invocation of collateral estoppel," provided the other elements of the defense have been met).

*Constitutional Arguments*

 Castillo–Alvarez contends that his prosecution and conviction violated his rights under the Privileges and Immunities Clause. He provides no support for this argument, and therefore we decline to address it on appeal. *See State v. Wembley*, 712 N.W.2d 783, 795 (Minn.App.2006) ("An assignment of error in a brief based on mere assertion and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection." (quotation omitted)), *aff'd on other grounds*, 728 N.W.2d 243 (Minn. 2007). The district court found that the Privileges and Immunities Clause did not apply to bar Castillo–Alvarez's prosecution, and no error is obvious on mere inspection.

 Castillo–Alvarez also contends that his prosecution in Minnesota violated his constitutional right to equal protection, apparently because none of the others involved in G.S.E.'s death were prosecuted in Minnesota. Castillo–Alvarez raised an equal-protection argument to the district court in his motion to dismiss, but based his argument on statute-of-limitation grounds. He did not raise the current equal-protection argument, relating to the

state's failure to prosecute other individuals, to the district court, and thus we conclude the issue is waived for purposes of appeal. *See Roby v. State*, 547 N.W.2d 354, 357 (Minn.1996).

*Ineffective Assistance of Counsel*

 Castillo–Alvarez claims that his counsel acted ineffectively in failing to call two witnesses and in advising him not to testify. While an ineffective-assistance-of-counsel claim should typically be raised by a postconviction petition for relief, *see State v. Gustafson*, 610 N.W.2d 314, 321 (Minn.2000), we believe that, given the state of the record here, we may address it on direct appeal. *See Voorhees v. State*, 627 N.W.2d 642, 649 (Minn.2001).

 "Claims of ineffective assistance of counsel involve mixed questions of law and fact, which we review de novo." *Vance v. State*, 752 N.W.2d 509, 513 (Minn. 2008). To make this claim, Castillo–Alvarez must show that "(1) his counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that, but for his counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Nissalke*, 801 N.W.2d 82, 111 (Minn.2011) (quotation omitted). "Because it is presumed that the lawyer is competent to provide the guiding hand that the defendant needs, the burden rests on the accused to demonstrate a constitutional violation." *State v. Dalbec*, 800 N.W.2d 624, 628 (Minn.2011) (quotation omitted).

 Castillo–Alvarez first contends that his trial counsel was ineffective because he did not call Lua or Juan Astello as witnesses or investigate whether they would be available to testify. He asserts that these men "would have testified on [Castillo–Alvarez's] behalf if arrangements

had been made to transport them to the hearing." Yet, Castillo–Alvarez provided no support for this bare assertion by, for example, providing affidavits from the men about their possible testimony.

■ Even more importantly, trial counsel's decision about which witnesses to present is within counsel's discretion, and we will not review that decision on appeal. *See State v. Voorhees*, 596 N.W.2d 241, 255 (Minn.1999) ("What evidence to present to the jury, including which defenses to raise at trial and what witnesses to call, represent an attorney's decision regarding trial tactics which lie within the proper discretion of trial counsel and will not be reviewed later for competence.").

■ Castillo–Alvarez next contends that his trial counsel was ineffective because he advised him not to testify at trial. He asserts "that he was never informed of the possible consequences of not testify[ing] on his own behalf[,] that is no evidence would be presented contrary to the state's case and that he would then likely be convicted." Castillo–Alvarez provides no support for this contention, and there is no indication in the record that this waiver was not made knowingly and voluntarily. *See State v. Berkovitz*, 705 N.W.2d 399, 405 (Minn.2005) ("A defendant has the burden of proving on appeal that [he] did not voluntarily and knowingly waive [his] right to testify.").

■ Moreover, it is well settled that advising a client not to testify does not render trial counsel incompetent. *See State v. Armstrong*, 282 Minn. 100, 102, 163 N.W.2d 67, 69 (1968) ("We are not prepared to say that a defendant advised to remain off the witness stand has been ill served by his attorney. There is nothing in the record before us to demonstrate that the advice, if given, was without good reason."). Similarly, nothing in this record

persuades us that counsel's advice to stay off the witness stand was unreasonable.

In sum, the performance of Castillo–Alvarez's trial counsel did not fall below an objective standard of reasonableness. His ineffective-assistance-of-counsel claim is therefore without merit.

## DECISION

We affirm Castillo–Alvarez's convictions because his prosecution in Minnesota did not violate his rights to be free from double jeopardy under either Minn.Stat. § 609.045 or the Minnesota Constitution; and the district court did not erroneously admit his unrecorded statement or certain statements made by witnesses at trial. We also affirm Castillo–Alvarez's sentence because the district court acted within its discretion in sentencing him. Because the district court improperly ordered Castillo–Alvarez to pay the cost of a pretrial transcript not used as an exhibit at trial, however, we reverse the costs-of-prosecution order in the amount of $918.

**Affirmed in part and reversed in part; motion denied.**