*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2083**

State of Minnesota,
Respondent,

vs.

Brian James Liimatta,
Appellant.

**Filed December 21, 2015
Affirmed
Halbrooks, Judge**

Clay County District Court
File No. 14-CR-14-1578

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Brian J. Melton, Clay County Attorney, Pamela Harris, Assistant County Attorney, Moorhead, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Halbrooks, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HALBROOKS**, Judge

Appellant challenges his conviction of felony domestic assault, arguing that his right to a speedy trial was violated and that the district court abused its discretion by

admitting as a prior consistent statement the victim's recorded statement to police. We affirm.

## FACTS

On May 13, 2014, J.B.R. was watching television at his home when his neighbor P.L.C. frantically knocked on the door. P.L.C. was crying and screaming and appeared to be beaten up. Her face was puffy and bruised. P.L.C. told J.B.R. that her boyfriend had beaten her up and asked J.B.R. to call the police. While J.B.R. was on the phone with the 911 dispatcher, J.B.R. asked P.L.C., "Who beat you up?" J.B.R. relayed P.L.C.'s response to the 911 dispatcher and said, "Brian Liimatta."

Officers John Giddings and Trent Bachman responded to J.B.R.'s 911 call. Officer Giddings stayed with P.L.C. at J.B.R.'s home while Officer Bachman went to P.L.C.'s home to look for appellant Brian Liimatta. Officer Giddings noted that P.L.C. was extremely upset, hysterical, and crying. Officer Giddings observed dried blood at the corner of P.L.C.'s lip, an abrasion to her forehead, and a bruise and a large bump on her eye. When Officer Bachman arrived at P.L.C.'s home, he looked through a window and saw Liimatta crouched down behind the kitchen table. Officer Bachman asked Liimatta to come outside and talk with him. Liimatta stood up and came to the front door. Liimatta told Officer Bachman that he and P.L.C. had been arguing about "boyfriend, girlfriend stuff." Officer Giddings then arrived and arrested Liimatta for domestic assault.

After Liimatta left the residence, Officer Giddings recorded a conversation with P.L.C. P.L.C. told Officer Giddings that she and Liimatta had gone out to eat that day

with her family to celebrate her graduation. She and Liimatta were not getting along. Liimatta disappeared, and she found him to be really upset when she got home. P.L.C. called Liimatta a "piece of sh-t," and he became hostile. Liimatta punched P.L.C. several times in the face and threatened to kill her and her father. P.L.C. was able to calm Liimatta down, and she ran away to her neighbor's house.

The state charged Liimatta with felony domestic assault and terroristic threats. On May 21, 2014, Liimatta pleaded not guilty and demanded a speedy trial. The district court scheduled the trial for July 15. On June 9, the district court held a hearing on the state's motion for a continuance because the primary testifying officer would be in Maryland on a previously scheduled trip during the original trial date. The district court granted the continuance and scheduled the trial for August 12. Liimatta objected to the continuance and reasserted his demand for a speedy trial.

On August 12, 83 days after Liimatta originally demanded a speedy trial, the jury trial began. Before the trial started, the district court denied Liimatta's motion to dismiss for violation of his right to a speedy trial.

P.L.C. had difficulty remembering the events of that evening during her testimony. She testified that she and Liimatta were fighting and that she had a bruise on her eye when the police arrived that night. P.L.C. assumed that Liimatta had caused the bruise because he was the only person with her that night. On cross-examination, Liimatta's attorney questioned P.L.C. about the amount of alcohol that she drank that night. P.L.C. agreed that she drank "too much" and that her alcohol consumption made it difficult to remember the details of that night.

The state sought to admit into evidence P.L.C.'s recorded statement to Officer Giddings. Liimatta objected on the basis of hearsay. The district court overruled the objection and admitted the recording as a prior consistent statement.

The jury found Liimatta guilty of domestic assault but not guilty of terroristic threats. The district court sentenced Liimatta to 33 months in prison. Liimatta now appeals.

## D E C I S I O N

## I.

Liimatta argues that his right to a speedy trial was violated. Whether Liimatta's right to a speedy trial was violated presents a constitutional question, which we review de novo. *State v. Griffin*, 760 N.W.2d 336, 339 (Minn. App. 2009). The state and federal constitutions guarantee the right to a speedy trial. U.S. Const. amend. VI; Minn. Const. art. I, § 6. In Minnesota, "[a] defendant must be tried as soon as possible after entry of a plea other than guilty. On demand of any party after entry of such plea, the trial must start within 60 days unless the court finds good cause for a later trial date." Minn. R. Crim. P. 11.09(b). To determine whether a delay violates the right to a speedy trial, we use the balancing test announced by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530-33, 92 S. Ct. 2182, 2192 (1972). *State v. Windish*, 590 N.W.2d 311, 315 (Minn. 1999). "The test provides that a court must consider: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his or her right to a speedy trial; and (4) whether the delay prejudiced the defendant." *Id.* None of the factors

is necessary to find that a violation has occurred. *Id.* They are related factors that must be considered together with other relevant circumstances. *Id.*

### A. Length of Delay

The length of the delay is a triggering mechanism that determines whether analysis of the other factors is necessary. *Id.* When the length of delay is presumptively prejudicial, we must analyze the remaining factors of the test. *Id.* In Minnesota, delays beyond 60 days from the date of the speedy-trial demand are presumptively prejudicial. *Id.* at 315-16. The state concedes that the delay here was beyond 60 days from Liimatta's speedy-trial demand. Liimatta demanded a speedy trial on May 21. The trial started 83 days later on August 12. Because this delay raises a presumption that a violation has occurred, we must analyze the remaining factors of the test.

### B. Reason for Delay

The state has the burden to ensure a speedy trial. *Id.* at 316. In *Barker*, the Supreme Court stated that "different weights should be assigned to different reasons" for delay. 407 U.S. at 531, 92 S. Ct. at 2192. A deliberate attempt to delay the trial in order to hinder the defense should weigh heavily against the state. *Id.* More neutral reasons such as negligence or overcrowded courts should weigh less heavily against the state but should nonetheless weigh against the state. *Id.* "[A] valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* The unavailability of a witness normally constitutes good cause for delay. *Windish*, 590 N.W.2d at 317. But the "prosecutor must be diligent in attempting to make witnesses available and the unavailability must not prejudice the defendant." *Id.*

5

The district court granted the state's motion for a continuance because the primary testifying officer was going to be in Maryland the week of trial on a previously scheduled trip. There is no evidence in the record to show that the state was diligent in attempting to make the officer available to testify other than informing the officer of the trial date. But there is also no evidence to show that the state was deliberately trying to delay the trial in order to hinder the defense. The state brought this matter to the district court's attention five weeks before the scheduled trial date. The district court asked the prosecutor whether moving the trial earlier to July 1 would work, and the prosecutor did not object but said that it would be a "little bit difficult." The district court scheduled the trial for the next available date on its calendar, August 12. Because there is no evidence that the state deliberately delayed the trial in order to hinder the defense, the officer's unavailability is a neutral reason for delay. This factor should therefore not weigh heavily against the state. But it still weighs against the state because the burden is on the state to ensure a speedy trial, and there is no evidence that the state was diligent in attempting to make the officer available.

### C. Assertion of Speedy-Trial Right

A defendant's assertion of his speedy-trial right is entitled to strong evidentiary weight in determining whether the right has been violated. *Barker*, 407 U.S. at 531-32, 92 S. Ct. at 2192-93. It is undisputed that Liimatta asserted his speedy-trial right multiple times. He initially demanded a speedy trial when he pleaded not guilty on May 21. He reasserted the demand at hearings on June 9 and August 6. This factor therefore weighs in favor of Liimatta.

6

### D. Prejudice

Prejudice should be analyzed in light of the interests that the speedy-trial right is designed to protect. *Id.* at 532, 92 S. Ct. at 2193. "The Supreme Court has identified three interests that are protected by the right to a speedy trial: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) preventing the possibility that the defense will be impaired." *Windish*, 590 N.W.2d at 318 (citing *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193). Preventing the possibility that the defense will be impaired is the most serious interest that the speedy-trial right protects. *Id.*

Preventing oppressive pretrial incarceration does not apply here because Liimatta was on a Minnesota Department of Corrections hold while awaiting trial. Liimatta was not subjected to oppressive pretrial incarceration because he would have remained in custody on the department of corrections hold anyway.

When Liimatta moved to dismiss for violation of his speedy-trial right, his attorney said that Liimatta "suffers the anxiety that comes from not knowing his fate." Other than his attorney's assertions, there was no evidence presented to show that Liimatta had any special anxiety or concern while awaiting trial.

When discussing the most serious interest protected by the right to a speedy trial, limiting the possibility that the defense will be impaired, the Supreme Court listed examples of when prejudice occurs. "If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193.

7

Liimatta did not call any witnesses at trial, so the delay did not impair his defense by causing his witnesses to become unavailable or by causing them to lose their recollection. The only possible impairment to Liimatta's defense is the fact that he had a new attorney for trial. No reason was given as to why Liimatta's original attorney was unavailable for trial.

Liimatta argues that the delay deprived him of his right to an attorney with whom he had established an attorney-client relationship. *See In re Welfare of M.R.S.*, 400 N.W.2d 147, 152 (Minn. App. 1987) ("[O]nce an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objection of both the defendant and counsel."). But the record shows that Liimatta was satisfied with his trial counsel. Before the trial began, the district court asked Liimatta if he was okay proceeding with his new trial counsel instead of his previous counsel. Liimatta responded, "Yes." The district court went on to ask Liimatta, "Do you have any concerns today as it relates to you being effectively represented by the public defender's office due to the rather last minute change in your lawyer?" Liimatta replied, "No." Nothing in the record indicates that Liimatta's trial counsel was unprepared for trial. The delay therefore did not prejudice Liimatta's defense.

In sum, although the unavailability of the state's witness that caused the delay, that is a neutral reason for delay because the state did not deliberately attempt to delay the trial. Most importantly, the delay did not prejudice Liimatta's defense in any way.

8

Considering all the *Barker* factors together, we conclude that Liimatta's right to a speedy trial was not violated.

## II.

Liimatta argues that the district court abused its discretion by admitting P.L.C.'s recorded statement to Officer Giddings as a prior consistent statement. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted).

Hearsay is not admissible unless it falls under an exception. Minn. R. Evid. 802. "[A] witness's prior statement that is consistent with his trial testimony is admissible as nonhearsay evidence if the statement is helpful to the trier of fact in evaluating the witness's credibility, and if the witness testifies at trial and is subject to cross-examination about the statement." *State v. Bakken*, 604 N.W.2d 106, 108-09 (Minn. App. 2000) (citing Minn. R. Evid. 801(d)(1)(B)), *review denied* (Minn. Feb. 24, 2000). For a prior consistent statement to be admissible, the witness's credibility must be challenged, and the statement must bolster the witness's credibility with respect to the challenged aspect of the credibility. *Id.* at 109.

The record shows that Liimatta challenged P.L.C.'s credibility during the trial. During his opening statement, Liimatta's attorney said, "What we do not have is an uninterested third party, or any third party, who is in a position to say what really happened or what really exactly was said." Because only P.L.C. and Liimatta were

9

present in the home that night, P.L.C.'s credibility was central to the case. *See id.* (noting that the credibility of the only witness to present firsthand evidence was central to the case). Liimatta's attorney also stated in his opening statement that there was an "alcohol fog" and "nobody will be able to say for sure what happened." On cross-examination, Liimatta's attorney questioned P.L.C. about having "too much" alcohol on the night of the incident and how that made it difficult to remember the details. P.L.C. said throughout her testimony that she could not remember details from that night. Because of P.L.C.'s poor recollection, admitting her recorded statement to Officer Giddings would help the jury assess her veracity. *See id.* (concluding that the district court properly decided that a prior consistent statement would bolster the witness's credibility because of the witness's "sketchy recollection at trial").

The next question the district court considered was whether the trial testimony and the prior statement were consistent. "The trial testimony and the prior statement need not be verbatim." *Id.* The district court found that P.L.C.'s prior statement was consistent with her testimony. In her prior statement, P.L.C. stated that Liimatta punched her and hit her in the face. At trial, the following exchange occurred between P.L.C. and the prosecutor on direct examination:

> Q. What do you remember happening in your trailer that day?
> A. Just us fighting and I kind of—I remember I was—us both sitting. The last thing I remember is us sitting on the couch and I walked out my back door.
> Q. Why did you walk out the back door?
> A. I don't know. I was crying.
> Q. Why were you crying?
> A. We were fighting.
> . . . .

10

> Q. . . . When you say you were "fighting," what do you mean by that?
>
> A. Like yelling. I don't know. Like I wanted to get out.
>
> . . . .
>
> Q. . . . When the police showed up did you have any injuries?
>
> A. Yes.
>
> Q. What type of injuries did you have?
>
> A. Like a bruise and rug burn.
>
> Q. Where was the bruise?
>
> A. On my eye.
>
> Q. Where did that come from?
>
> A. I'm assuming, Brian.
>
> Q. Why would you assume it was Brian?
>
> A. I don't know. Just hard. There was nobody else there but us.
>
> Q. No one else in the trailer?
>
> A. Correct.
>
> Q. Did you have that bruise on your eye before you got home that night?
>
> A. No.
>
> Q. Was there anyone around you other than the defendant?
>
> A. No.
>
> . . . .
>
> Q. . . . When you talked to the police officer—you said you can't remember exactly what you told him. Do you have any reason to doubt that what you told him was what happened in your trailer that night?
>
> A. No.

While P.L.C.'s trial testimony was less specific than her prior statement, her testimony was not inconsistent with her prior statement. Her testimony that she and Liimatta were fighting and her assumption that Liimatta caused the bruise on her eye is reasonably consistent with her prior statement that Liimatta punched her and hit her in the face. The district court did not abuse its discretion by admitting P.L.C.'s recorded statement to Officer Giddings as a prior consistent statement.

**Affirmed.**

11